Long, Respondent, vs. Tax Commission and others, Appellants.

*April 6—October 11, 1932.*

For the appellants there were briefs by the *Attorney General, F. C. Seibold,* assistant attorney general, and *Morris Barnett,* district attorney of Kenosha county, and oral argument by *Mr. Seibold.*

For the respondent the cause was submitted on the briefs of *Randall, Cavanagh, Stephenson & Mittelstaed* of Kenosha.

The following opinion was filed May 10, 1932:

NELSON, J. In 1929 the assessor of incomes for Kenosha county made additional assessments of the plaintiff's income for the years 1925, 1926, and 1927. The additional assessments relate solely to profits claimed to have been made on the sale of Nash Motors Company stock over and above the amounts reported as profits by the plaintiff in his income tax returns. Beginning in 1919 Harold E. Long, hereinafter called the taxpayer, purchased at different times and at different prices a considerable number of shares of Nash Motors Company common stock and from time to time sold portions of his holdings. Only sales made during the years 1925, 1926, and 1927 are involved herein. In 1925 the taxpayer sold 50 shares of stock in said company and reported a profit on that sale of $3,930.50; in 1926 the taxpayer sold 700 shares of such stock and reported a profit on such sales of $3,467.33; in 1927 the taxpayer sold 500 shares of such stock and reported a profit of $38,755, and, during the same year, his wife sold 1,100 shares of

such stock and the taxpayer reported a profit thereon of $35,359.50. The assessor of incomes increased the 1925 profit by $5,886, the 1926 profit by $28,689.17, and the 1927 profit by $21,432.50.

This controversy, however, involves only additional profits claimed to have been made on the sale of 50 shares of stock in 1925, 300 shares in 1926, and 300 shares in 1927. All of the stock involved in this controversy was represented by certificates which were clearly identified as having been purchased and sold for definite amounts of money.

Pursuant to the provisions of sec. 71.22 (1), Stats., the Wisconsin Tax Commission adopted a regulation prescribing an average cost basis to be used in determining profit or loss on sales of shares of the same corporate stock. This regulation is as follows:

"It is the rule of the commission that where shares of the same stock are purchased at different times and different prices, the average cost of such shares is to be used in computing profit or loss on the subsequent sale of any of the shares held without regard to whether the certificates of stock can be identified with particular purchases and selling prices. The position of the commission is that 'one share is identical with another and the certificates which are issued are merely evidences of the ownership of a certain number of shares.' This is the rule of the commission and operates in the same manner on all taxpayers whether or not they can follow specific purchases through certificates."

The appellants contend that one share of stock in a corporation is identical with another; that stock certificates are merely evidence of ownership of an interest in a company; that when a stockholder sells a portion of his holdings, even though by the transfer of certificates identified with a specific purchase, the property sold is not so many specific shares but is simply so many shares of a total number of like shares owned by the seller; and that the cost of the shares

sold is simply that proper proportion of the total cost of all shares held by the seller at the time of the sale; in other words, average cost. They further contend that in determining taxable gain or income upon the sale of stock, the average cost to the taxpayer of his stock constitutes the actual cost of each share thereof and that such method is correct, proper, and allowable, operates fairly and uniformly in all cases, and is the proper basis for determining cost.

The taxpayer, on the other hand, contends that in case of a sale of a portion of his holdings in a corporation, by transfer of an identified certificate, the property sold is the specific or selfsame shares and that the cost to him of the property sold is the price which he paid when he acquired the particular certificate. In other words, that when a certificate can be identified, the taxable gain or income upon sale thereof is the difference between the actual cost of such identified certificate and the sale price thereof.

The principal question to which this controversy gives rise is whether the rule adopted by the commission provides a reasonable, proper, and allowable method for determining profit or loss on the sale of corporate stock. It is apparent that this question can never arise when the owner of stock makes a sale of all of his stock holdings in a particular corporation, nor when he makes a sale of only a portion of his stock holdings where all of his shares were purchased at the same price, though at different times. The question can only arise when the owner has purchased shares of stock at different times and at different prices, when the sale involves only a portion of his holdings, and when the sale further involves identified certificates, the actual cost of which appears.

This question has not heretofore been presented to this court. The method promulgated by the commission does not rest upon any statute but upon the authority conferred

upon the Tax Commission to make such rules and regulations as it deems necessary in order to carry out the provisions of the income tax law, sec. 71.22 (1).

The Tax Commission contends that, although a sale of stock involved the delivery and transfer of certificates of stock, such certificates are not property but constitute merely evidence of an interest owned by a stockholder in a corporation (5 Fletcher, Cyc. Corp. pp. 5594, 5595; *Button v. Hoffman,* 61 Wis. 20, 20 N. W. 667) ; that stock certificates are not the stock, but merely evidence the holder's ownership of stock (5 Fletcher, Cyc. Corp. p. 5604; *O. L. Packard M. Co. v. Laev,* 100 Wis. 644, 647, 76 N. W. 596; *Levy v. Sattler,* 169 Wis. 308, 314, 172 N. W. 738; *Howbert v. Penrose,* 38 Fed. (2d) 577, 579). That certificates of stock are not stock in the corporation but merely evidence the holder's interest in the corporation, seems to be the universal holding of the courts.

The method of determining taxable gain or profit on sales of stock under similar circumstances has been considered by the courts in but few instances. The holdings of the courts are not unanimous where the sale involves specific or identified certificates, the cost of which may be definitely determined. See *Howbert v. Penrose, supra.* In *Towne v. McElligott,* 274 Fed. 960, the district court for the Southern district of New York enunciated a rule other than average cost. This case was decided in 1921 and the particular method therein stated seems not to have been approved by any other court. That particular case dealt with a situation where sales were made after a fifty per cent. stock dividend had been declared, without additional cost to the taxpayer. In the following year the United States supreme court handed down a decision in *Miles v. Safe Deposit & T. Co.* 259 U. S. 247, 42 Sup. Ct. 483, which involves taxable gain on the sale of subscription rights to thirty-five

shares of additional authorized stock. The taxpayer therein, prior to becoming entitled to subscription rights to thirty-five shares of stock of the Hartford Fire Insurance Company, owned thirty-five shares of stock of said company, which original shares were reasonably worth the sum of $710 per share. The stock of the company, consisting of 20,000 shares, was increased to 40,000 shares. Each stockholder was permitted to subscribe for an amount of stock equal to his prior holdings, at $150 per share. The taxpayer therein transferred his subscription rights to another for the sum of $358.48 per share, the transferee to pay the company $150 per share. The trial court, in computing the profit on the sale of the subscription rights, took the value of the old shares, prior to the authorization of the stock increase, at the sum of $710 per share, added the $150 required to be paid by the stockholder or his assignee in order to obtain a share of the new stock, making the total cost of the two shares, one old and one new, $860, and divided the sum of $860 by two, thereby determining the value of each share of stock to be $430. The subscription rights sold for $358.48 but the transferee was required to pay an additional $150 per share. The sum of the sale rights per share, plus $150, was treated as equivalent to a sale of fully-paid shares at $508.48 or $78.48 in excess of the $430 which the court found represented the cost to the plaintiff. The court, in affirming the judgment of the district court, said (p. 253):

"Hence the district court rightly held defendant in error liable to income tax as to so much of the proceeds of sale of the subscription rights as represented a realized profit over and above the cost to it of what was sold. How the gain should be computed is a matter of some contention by the government in this court; but it admits of little doubt. To treat the stockholder's right to the new shares as something new and independent of the old, and as if

it actually cost nothing, leaving the entire proceeds of sale as gain, would ignore the essence of the matter, and the suggestion cannot be accepted. The district court proceeded correctly in treating the subscription rights as an increase inseparable from the old shares, not in the way of income but as capital; in treating the new shares if and when issued as indistinguishable legally and in the market sense from the old; and in regarding the sale of the rights as a sale of a portion of a capital interest that included the old shares."

In *Ayer v. Blair,* 25 Fed. (2d) 534, the appellant therein had purchased blocks of bank stock aggregating 300 shares at the cost of $120,637.50, the ownership of which was evidenced by eight certificates of stock. Thereafter the bank doubled its capital stock and offered one new share of stock at $100 to each stockholder. The appellant therein exercised his rights as a stockholder and purchased 300 new shares for $30,000. Thereafter appellant sold 300 shares of stock, which sale was evidenced by the delivery of the original eight certificates. The sale price was $85,500, and the seller claimed a loss of $35,137.50 on such sale. The commissioner therein refused to accept this computation and held that the cost of both the old and the new shares should be combined and considered together in order to determine the basis upon which gain or loss should be determined. Accordingly, he added to $120,637.50, the cost of the old shares, $30,000, the cost of the new shares, thereby finding a total cost of $150,637.50 for the combined 600 shares, and found that the sale of 300 shares for $85,500 showed a corresponding gain instead of a loss. The court approved of that method in these words (p. 535) :

"We think the board's decision is right. The 300 shares of stock which appellant first purchased, and the 300 shares which he afterwards sold, were not the same shares in contemplation of law, notwithstanding that the original certificates of stock were delivered to the purchaser to

complete the sale. The parties were not dealing with mere paper certificates, but with proportionate interests in the ownership of the bank. When the capital stock of the bank was doubled, and appellant's holding was similarly increased, he continued to hold the same proportion as before the bank's capital, represented, however, by 600 shares, instead of only 300, at a total cost of $150,637.50. The commissioner rightly computed the cost of the 300 shares sold by appellant at the one-half of the total cost, to wit, $75,318.50." Citing *Towne v. McElligott*, 274 Fed. 960, and *Miles v. Safe Deposit & T. Co.* 259 U. S. 247, 42 Sup. Ct. 483.

In Montgomery's 1927 Income Tax Procedure, vol. 1, pp. 441, 442, in a discussion of the average cost method, it is stated:

"The theory of the Treasury's procedure is wrong. When different purchases of the same issue of stock are made, the actual result is an average cost. This is true in any event at March 1, 1913, at which time the entire interest of any taxpayer in one property would be merged and revalued. When a taxpayer buys 100 shares of a stock at 80 and later buys 100 shares at 60, he owns 200 shares at 70, and any subsequent accounting should be based on the average. There are difficulties in the application of the average rule when the certificates for the shares can be identified because there may be an actual intention on the part of the taxpayer to separate the transactions. The exercise of the right to select the certificates to be sold, even though not in conflict with the regulations, may defeat the intention of the law, for the taxpayer, in making a sale, may select those lots of stock which he had bought at high prices."

We conclude that the rule adopted by the Tax Commission prescribing that average cost of stock be used in determining profit or loss on a sale thereof is a reasonable administrative measure which does not tax as income that which is not income; that that method does not result in a fictitious cost but establishes the actual cost, and that the

676

method is a correct and proper one for the commission to adopt.

It appears, by agreement of the parties, that the court inadvertently included within its judgment, canceling and setting aside the assessment, certain additional taxes which were not in dispute and which are not involved in this controversy. However, since the action must be reversed for the reasons hereinbefore stated, it becomes unnecessary to pay any attention to the inadvertence of the court in canceling an assessment which was not in dispute.

*By the Court.*—Judgment reversed for further proceedings in accord with the opinion.

A motion for a rehearing was denied, with $25 costs, on October 11, 1932.