WHITMAN, Plaintiff, vs. DEPARTMENT OF TAXATION, Defendant.  [Two appeals.] *

*April 7—June 1, 1942.*

\* Motion for rehearing denied, with $25 costs, on September 16, 1942.

566

567

For the plaintiff there was a brief by *Pommerening & Kuehl,* attorneys, and *E. C. Pommerening* and *Phyllis Hughes* of counsel, all of Milwaukee, and oral argument by *Mr. Pommerening* and *Miss Hughes.*

For the defendant there were briefs by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

FOWLER, J.   An audit of the income of James R. Whitman was made by the Wisconsin Department of Taxation, hereinafter referred to as the "department," for the years 1927 to 1935, inclusive.   As a result the department assessed an additional income tax of $68,288 against the taxpayer.   The taxpayer duly took the assessment before the board of tax appeals, hereinafter referred to as the "board."   The board reduced the assessment to $33,075.   Both parties duly appealed the assessment to the circuit court for review.

The assessments were based on receipts by the taxpayer from J. C. Penney Company, hereinafter referred to as the "company," of certain classes of corporate stocks of that company.   From the judgment of the circuit court modifying the assessment by the board both parties appeal.

The matters in controversy are succinctly stated in the brief of the taxpayer and will be taken up *seriatim* as there stated:

(1) Does the receipt of the 755 shares of the common (conversion) stock of the J. C. Penney Company by James R. Whitman, petitioner, constitute taxable income to the petitioner, or is it part of a nontaxable exchange?

The claim of the department as to the seven hundred fifty-five shares is that they were issued to the taxpayer on surrender by the taxpayer of the contract referred to in the statement preceding the opinion when the company exercised the right it reserved by the terms of the contract to call it in and that these shares were delivered to the taxpayer as compensation for the surrender of that contract and taxable as income then received at the difference between the amount then paid therefor and their market value. The taxpayer claims that these shares are not taxable, under sec. 71.02 (2) (i), Stats., as received in exchange for his classified stock upon the reorganization of the company.

The change of the corporate structure of the company went into effect on January 1, 1927. The seven hundred fifty-five shares were delivered to the taxpayer in 1929. Up to December 31, 1928, the contract was in force. If we accept the terms of the contract as governing the rights of the taxpayer as to the taxation of the shares the contention of the department must be sustained. We consider that it must be so accepted. It was headed: "Managers' Conversion Contract." It definitely recited that the parties expressly agreed that the taxpayer had received preferred stock equal in value to the book value of the stock surrendered "in full exchange" for the surrendered stock. It further provided that the company would pay the manager each year "as added compensation, in addition to the regular salary received by him" the same share of the profits of the store that he formerly received. It was manifestly the purpose of the contract to pay to the taxpayer in addition to his regular stipulated salary for his personal services the same income from the store of which he was manager that he would have received had the previous situation continued, and to continue such payment as long as he continued as manager of the store. The contract used terms commonly used in employment contracts. The manager agreed to continue as manager of the store and to devote his full time and best efforts to performance of his duties.

One paragraph of the contract recited: "It is specifically understood that this is a personal service contract and that the right to receive added compensation as herein provided and the right to purchase common stock cannot be assigned by the associate [manager]."

The contract provided that it should remain in force as long as the taxpayer remained manager of the store, but the company reserved the right to terminate it at the end of a calendar year by paying the amount accrued under it and permitting the taxpayer to take stock on the same basis that he might take it on ceasing to become manager.

The statutes governing the rights of the parties so far as material are set out in the margin.[1]

---

[1] 71.01 *Persons and subjects taxable.* There shall be assessed ... a tax on all net incomes as hereinafter provided, by every person residing within the state ... except as hereinafter exempted. ...
71.02 *Definition of terms; what income taxable.* ...
(2) The term "gross income," as used in this act, shall include:
...

(c) All wages, salaries or fees derived from services. ...

(d) All profits derived ... from the sale or other disposition of real estate or other capital assets. ... If shares of stock in a corporation acquired subsequent to January 1, 1934, are sold from lots acquired at different dates or at different prices, the basis for determining gain or loss shall be that of the specific shares sold. If the identity of the lots cannot be determined, the stock sold shall be charged against the earliest acquisitions of such stock. The basis for determining gain or loss on sales of stock acquired prior to January 1, 1934, shall be the average cost of all such shares of the same stock, determined in accordance with the regulations of the tax commission in effect on January 1, 1934. ...

(h) And all other gains, profits or income of any kind derived from any source whatever except such as hereinafter exempted.

(i) 1. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. ...

4. If there is distributed, in pursuance of a plan or reorganization, to a stockholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the distributee from the receipt of such stock or securities shall be recognized. ...

6. The term "reorganization" means ... (c) a recapitalization, or change in the form of capitalization, ... however effected.

Sec. 71.01, Stats., makes all the taxpayer's net income taxable. It would seem beyond dispute that compensation for services is taxable as income under sec. 71.02 (2) (c) which makes taxable "all wages, salaries or fees derived from services" however the compensation may be designated or considered by the taxpayer. Under the contract an amount was paid "each year [for 'personal services'] as added compensation, in addition to the regular salary received" by the taxpayer. By the contract the amount so paid was salary in addition to the regular salary fixed as to amount. It would seem plain that as long as the contract remained in force the amount paid annually under the contract was taxable as salary "in addition to the regular salary" just as a bonus paid employees pursuant to a plan or practice of a corporation is taxable. The taxpayer is still the manager of the Appleton store. Had the contract not been called in he would have paid a tax on the amount received under the contract during all of the thirteen intervening years. Being so taxable, when the contract was surrendered, if a stipulated sum equal to the difference between the cost and value of the stock received had been payable on surrender of the contract, that sum would have then been taxable as income as the equivalent of the taxable annual income that ceased on the surrender of the contract. With equal reason the difference between the cost and value of the stock is taxable as money's worth.

The claim of the taxpayer that the seven hundred fifty-five shares were delivered in exchange for the classified stock is contrary to the terms of the contract itself which expressly declares that the preferred stock was delivered "in full exchange" for the classified stock of the store of which the taxpayer was manager. And as to all of the classified stock delivery of other stock in exchange for it was made when that stock was surrendered to the company. The delivery of the seven hundred fifty-five shares was not made at any such time, nor was it made in exchange for any such stock but in ex-

change for the contract. The shares having been exchanged for the contract, the contract, to make the shares exempt, must have been either "stock or securities" under 1 or 2 of par. (i) of sec. 71.02 (2), Stats. Manifestly the contract was not stock. While the word "securities" is comprehensive and may have different meanings under different statutory contexts, the word in "commercial parlance" refers to "live and negotiable commercial obligations," and particularly to "investments." This meaning was attributed to the word in *Boston Railroad Holding Co. v. Commonwealth,* 215 Mass. 493, 102 N. E. 650, and in *Lewis v. Creasey Corp.* 198 Ky. 409, 248 S. W. 1046. This meaning is also in accord with the scope note of Restatement of Security which states, p. 1 :

"Security is an interest in chattels, in land, or in the obligation of a *third party.* A security interest must be the result of a transaction that gives recourse against a particular chattel or land or against a *third party* on an obligation."

A security is an instrument evidencing some one of these classes of interests. A contract of service for a term of years fixing the compensation to be paid for the service is therefore not a security. It gives no recourse against a chattel or land or a third party on an obligation. The instant contract creates no tax-free situation because the contract was neither a security exchanged for stock under (i) 1 of (2) of the statute nor was the stock distributed without exchange for a security under (i) 4. See *United States v. Hendler,* 303 U. S. 564, 58 Sup. Ct. 655, 82 L. Ed. 1018.

We are of opinion that the ruling of the department and of the board as to the seven hundred fifty-five shares of stock was correct and should be affirmed.

(2) Is the difference between the fair market value at the time of the purchase, and the cash price paid by the petitioner to the J. C. Penney Company for shares of common (expansion) stock purchased by the taxpayer during 1927–1935, inclusive, additional compensation and taxable to him under sec-

tion 71.02 (2) (c), Wisconsin Statutes, or was said stock a tax-free distribution to him as part of and pursuant to a plan of reorganization within the provisions of section 71.02 (2) (i), Wisconsin Statutes?

We consider that the sale to the taxpayer of the expansion stock was independent of the reorganization of the company. Like rights were granted to the taxpayer under the previous setup, and might have been granted had that setup not been changed. The nature of the stock purchased prior to reorganization was not precisely the same as the expansion stock but the purchase of the stock attributed to new stores was limited to employees and the right to purchase was assigned as the company saw fit. Had the original setup continued, the price and value of the stock sold to the taxpayer and the number of shares allotted to the taxpayer doubtless would have been different, but the gain to the taxpayer might have been equally large. The practice of the company in selling its expansion stock to its employees only is not essentially different from the common practice of corporations on issuing new stock to limit its sale to its stockholders by issuing to them rights to buy according to their holdings, which rights may be sold to the public. In the instant case the right to purchase might not be transferred, but the taxpayer could accomplish the same result as selling his rights by purchasing the stock offered to him and immediately selling it. The real question involved seems not to be whether the gain through purchase of the expansion stock is tax free because of the reorganization of the company, but whether the imposition of a tax should be deferred until sale of the stock and the tax then be imposed on the difference between cost and sale price. Had the rights to purchase been transferable and sold, the amount received for them would have been taxable as income. The value of the rights received were immediately the same whether they were sold or exercised by the taxpayer. On the whole we consider that the difference between the cost and the value of the expansion stock was taxable under par. (h) of sub. (2) of the

statute as comprised within "all other gains, profits or income of any kind derived from any source whatever except such as hereinafter exempted." The expansion stock is manifestly not exempted as stock received in exchange for other stock or securities as within pars. (i) 1 or 2 of sub. (2) of the statute, and these cover all exemptions of the statute in any view applicable to the instant case.

(3) Is there any credible evidence to sustain the finding of the board of tax appeals valuing the common stock of the J. C. Penney Company in 1929 at $300, or is the valuation placed on it by the circuit court of $340 per share the proper value?

The department fixed the value of the expansion stock purchased by the taxpayer in 1929 at $300 per share. The board affirmed the finding. The circuit court changed the finding to $340 per share on the ground that there was no evidence in the record of any other value. The department based its finding of value on the appraisement of its auditor and the board based its finding on his testimony before the board. He testified that the market for the company stock was listed on the New York Curb Exchange in 1929 and that a financial journal issued April 13, 1929, gave a low of $330 and a high of $340 per share, and that the same journal of April 20th gave the week's range at a low of $339 and a high of $344.50 per share. While this is all the direct testimony of the auditor as to the value in 1929, the way the auditor fixed the value of the stock during 1928 appears. He gave the high for the year at $347 and the low at $321. He testified that "the market did support a slightly higher value but I gave the petitioner [taxpayer] the benefit of the doubt that there might have been a thin market in that year and scaled the market down. My thought was to place it at the lowest even figure so as to be conservative in the market value." He fixed the value in both years at $300. The board in valuing the stock in 1929 might properly apply to the market figures of 1929 the same "scaling" of the market by reason of a possible "thin market" that the auditor

applied to the 1928 market. Besides witnesses of the taxpayer, while admitting the correctness of the market prices as given by the trade journals quoted from by the auditor, fixed the market value at $150, $120 to $130, and $141. These witnesses fixed their valuation at approximately ten times earnings per share and gave no consideration to market quotations because of the effect of a suppositious "thin market." The department and the board while not accepting their judgment as to values might properly give their testimony some effect as justifying "scaling" the market to some extent in order to give a "conservative" valuation. We are of opinion that the court committed error in changing the valuation of the stock purchased fixed by the department and board.

(4) Is the average-cost basis the proper basis for computing the gain or loss upon the sale of J. C. Penney Company stock by the taxpayer during the years 1927–1935, both inclusive, many of the transactions being open-market transactions only with the certificates of stock never issued to the petitioner?

The department, the board, and the court applied the average basis of determining cost as stated in par. (d) of sec. 71.02 (2), Stats. That statute applies the average basis of determining gains to stock acquired prior to January 1, 1934. Counsel for the taxpayer urges that the language of the last sentence of the paragraph was not enacted until 1937 and that there is nothing in the statute to indicate that it was intended to be retroactively applied. However the rule of the amendment was applied independent of the amending statute in *Long v. Tax Comm.* 208 Wis. 668, 242 N. W. 562. This decision was rendered in 1932. The ruling was based on a rule of the commission which the court held the commission had power to establish under sec. 71.22 (1), Stats. 1931. The legislature by ch. 505, Laws of 1935, added to the end of par. (d) of sec. 71.02 (2):

"When shares of stock in a corporation are sold from lots acquired at different dates or at different prices and the identity

of the lots cannot be determined, the stock sold shall be charged against the earliest acquisitions of such stock."

This provision was changed by ch. 265, Laws of 1937, to read as set out in the margin and the last sentence of the statute as set out in the margin was added. It seems most likely that the 1937 amendment was intended to declare applicable up to 1934 the rule of the commission as existing in 1934, which was the same as in 1931, the application of which was upheld by the *Long* decision, *supra*. The intent of the legislature thus was to make the 1937 amendment retroactive.

The taxpayer claims, however, that while it has been numerously held the court will take judicial notice of the rules of administrative bodies, no rule of such a body becomes effective against the general public until it is published in such form as to be accessible to the general public and that there was no such publication of the rule of the Tax Commission, the predecessor of Department of Taxation, until 1932. The taxpayer contends that until that time, under our constitutional provision, sec. 21, art. VII, that "no general law shall be enforced until published," the rule of the Tax Commission did not become operative until published. Surely if no general law enacted by the legislature becomes effective until published, a rule of an administrative body does not become effective as a general law until published, and if the fact be that there was no publication of the rules of the Tax Commission until 1932 its rules up to that time were not effective as public laws. What may constitute a publication is discussed in *Sholes v. State,* 2 Pin. 499, 511. There is no evidence that the rule of the Tax Commission relied on by the department was published in any of the ways there indicated or in any other way likely to give notice to the general public. In such situation should we hold the rule of the Tax Commission adopted prior to 1932 presumptively published and in force, or ineffectual for absence of proof of its publication? "It [the law] presumes that every man in his private and official

character does his duty until the contrary is found." 1 Jones, Evidence, 75, 76, 78. The rule applies to "orders of administrative officers and tribunals performing functions of a *quasi-judicial* character." Jones, *supra,* 73, 74. In the *Long Case, supra,* and in *O. H. Ingram Co. v. Tax Comm.* 202 Wis. 202, 231 N. W. 160, this court assumed that the rule of the commission relating to average costs was in force, and inferentially must have presumed that it was published. We consider that we should presume here that the Tax Commission in adopting the rule invoked did what was necessary to render it effective.

*By the Court.*—The judgment of the circuit court is reversed so far as it modifies the order of the board of tax appeals, and otherwise affirmed, and the record is remanded with direction to the circuit court to affirm the order of the board of tax appeals.

* Motion for rehearing denied, with $25 costs, on September 16, 1942.