LAKE SUPERIOR DISTRICT POWER COMPANY, Respondent, vs. PUBLIC SERVICE COMMISSION, Appellant.

*January 15—February 25, 1947.*

40

For the appellant there was a brief by the *Attorney General, Harold H. Persons,* assistant attorney general, and *H. T. Ferguson,* chief counsel for the Public Service Commission, and oral argument by *Mr. Persons.*

For the respondent there was a brief by *Aberg, Bell, Blake & Conrad* and *Glen H. Bell,* all of Madison, and oral argument by *Mr. Bell.*

FRITZ, J.   In this opinion the appellant, Public Service Commission, is called the "commission" and the Lake Superior District Power Company is called the "utility."   The principal question on this appeal is raised by the commission's contention that the court (1) erred in adjudging the reversal of the commission's declaratory ruling that the provisions of sec. 184.10 (1), Stats., which required a fee to be paid in connection with a public-service corporation's application to the commission for approval of the issuance of its securities are applicable to a transaction proposed by the utility in relation to its shares of stock; and (2) likewise erred in adjudging the amendment of said declaratory ruling to read that,—

"The split-up of the outstanding common stock of" the utility from shares having a par value of $75 each into shares having a par value of $20 each, with no change in the total par value amount of common stock outstanding, which split-up was approved in a proceeding by the commission "did not constitute an issuance of securities subject to the fees or taxes provided in section 184.10 (1), Wisconsin statutes, even though such split-up of common stock resulted in changing the voting rights and consequent power of control of the business and affairs of Lake Superior District Power Company, as previously vested in the common and the preferred stockholders as groups. The changes in the rights of the preferred stockholders or in the characteristics of the preferred stock, which changes were approved by the Public Service Commission . . . did not constitute an issuance of securities subject to the fees or taxes provided in section 184.10 (1), Wisconsin statutes. No fee or tax was, or is payable under section 184.10 (1)," Stats., by the utility "in connection with the application filed by that company with the Public Service Commission of Wisconsin for approval of the transactions proposed in, and approved by such commission. . . ."

Sec. 184.10 (1), Stats., provides:

"Each public-service corporation on filing an application for authority to issue any securities to which this chapter is applicable shall pay with such application, prior to the issuance of a certificate, a fee of one dollar per thousand for each thousand dollars par value of each authorized issue of securities, but in no case less than ten dollars for any issue."

The commission claims that the fee of $2,670, which it demanded under that statute as a condition for the utility obtaining the commission's approval of the utility's proposed reclassification of its shares of common stock was proper because the exchange of its shares for the proposed new shares at different par value per share, but for the same total par value,—in connection with the amendment of the utility's articles of incorporation so as to (1) give its common stockholders preemptive rights to purchase future issues of common stock;

(2) increase from one half to two thirds the affirmative vote required of the preferred stockholders to permit the utility to do certain acts; (3) reduce the amount of unsecured indebtedness which it might incur without the specific consent of the preferred stockholders; and (4) reduce the time in which preferred stockholders might control the board of directors in the event of defaults in the payment of preferred stock dividends,— constitutes the shares which are to be received by stockholders in such exchange, a separate and additional issue of securities, which is therefore subject to the $1 fee per $1,000 prescribed by sec. 184.10 (1), Stats.

On the other hand the utility contends (1) that fee is to be paid only on an initial issue of capital stock; (2) that no such fee is payable by a public-service corporation on a reclassification—as in this case—of its shares of common stock by having its stockholders exchange and receive in place of their proportionate holdings of its entire issue of 35,600 shares of common stock of $75 par value, amounting in the aggregate to $2,670,000, 133,500 shares of $20 par value, amounting in the aggregate likewise to $2,670,000, which is the amount of the common stock it had been and still continued to be authorized to issue; and (3) that the exchange of shares of stock thus received by the stockholders does not result in any increase in the total amount authorized to be issued, nor does it constitute a new or additional issue of capital stock, because of which it can be considered the "issue of securities," within the meaning of that term as used in sec. 184.10 (1), Stats.

In considering those contentions and claims of the respective parties, it is important to note the history of the provisions in ch. 184, in relation to the fee imposed on "each authorized issue of securities." In the statutes of 1925, sec. 184.09 provided that no public-service corporation should "issue any stocks, certificates of stock, bonds, notes, or any other evidences of indebtedness" until it first obtained authority from the commission, and sec. 184.21 imposed a fee only upon the

issuance of "bonds, notes, or other evidences of indebtedness;" but no fee was imposed upon the issuance of any stocks or certificates of stock. By ch. 534, Laws of 1927, security or securities was defined in sec. 184.01, Stats., to "mean and include every share of stock, certificate of stock, bond, note or other evidence of debt issued by a public-service corporation;" and sec. 184.09 was amended to refer only to "securities" without specifying the various types; and there were some verbal changes in the fee provisions in sec. 184.21, but payment of fees, which was required to be paid thereby, was still confined to the issue of "evidences of debt." Stock issues were still not subject to any fee payment. In 1931 the definition of securities in ch. 184 was amended to read,—and still reads in sec. 184.01 (3),—"'Securities' means capital stock and evidences of indebtedness of a public-service corporation; . . ." and in 1931, sec. 184.21, which since 1925 imposed the fee upon the issuance of "bonds, notes, or other evidence of indebtedness," was renumbered as sec. 184.10 (1) and made applicable to the "issue of securities." Thus it is evident that it was never intended to impose the payment of a fee upon the mere certificates of stock. During the time separate shares of stock and certificates therefor were referred to in ch. 184 the fee imposed by any provisions therein was limited to bonds and other evidences of indebtedness. The fee was not made to apply to the issuance of securities generally until the definition of securities was changed to eliminate individual shares of stock, so that now the fee is imposed solely upon the issuance of capital stock. A mere change in the number of units or shares outstanding, without any increase in the total "capital stock" does not involve the issuance of any capital stock. A stock split-up is simply a further division of the existing units of capital stock. Any attempted construction of the present statutes to the contrary is definitely negatived by the above-stated history of ch. 184. Moreover, even without taking that history into consideration, the language presently used in

chs. 182 and 184 admits of no other conclusion as to the meaning of the statute.

It is universally recognized that the "capital stock" of a corporation is the amount paid in by stockholders in money, property, or by services, and that a share of stock is an undivided portion of such total capital stock. A stock certificate is merely evidence of the ownership of shares of stock. The certificate is not the stock, and the issuance of a stock certificate is not an essential transaction to create a stockholder. The issuance of the certificate may or may not constitute the issuance of a security, depending on whether stock is actually being issued by the transaction. If the new certificate simply replaces a lost certificate, or evidences a stock transfer, or a stock split-up, no new or additional stock is issued by such certificate. These fundamental concepts are stated as follows in 11 Fletcher, Cyc. Corp. (perm. ed. 1932) :

"Properly speaking, however, the term 'capital stock' signifies the amount fixed, usually by the corporate charter, to be subscribed and paid in or secured to be paid in by the shareholders of a corporation, either in money or in property, labor or services, at the organization of a corporation or afterwards, and upon which it is to conduct its operations. [p. 12, sec. 5079.]

"In its primary sense a share of stock is simply one of the proportionate integers or units, the sum of which constitutes the capital stock of the corporation. [p. 28, sec. 5083.]

"It is well settled that a certificate of stock in a corporation is not the stock itself. It is the mere evidence of the holder's ownership of the stock and of his rights as a stockholder to the extent specified therein, just as a promissory note is merely the evidence of the debt secured thereby, and as title deeds are merely the evidence of the ownership of land. [p. 55, sec. 5092.]"

The text then discusses various methods of issuing stock, such as upon subscription for cash, in payment for property, as a stock dividend, etc., but the split-up of outstanding stock is not mentioned as a possible way to "issue stock."

This court has held that a certificate of stock is not the stock itself but is simply evidence of title to an interest in a corporation. *Long v. Tax Comm.* 208 Wis. 668, 672, 242 N. W. 562; *Manufacturers Trust Co. v. Chris. Schroeder & Son Co.* 224 Wis. 580, 584, 271 N. W. 915, 273 N. W. 231. And these differences between "capital stock" and "stock certificates" are evidently recognized in the following statutory provisions:

"No corporation shall issue any stock other than dividend stock, except in consideration of money or of labor or property estimated at its true money value, actually received by it, equal to the par value thereof. . . ." Sec. 182.06, Stats.

"No securities shall be issued by any public-service corporation otherwise than for money, property or services actually received by it. The amount of money, and the value of the property or the services to be so received shall be: (a) In case of stock having a par value, not less than the par value thereof. . . ." Sec. 184.04, Stats.

"The capital stock of every corporation, divided into shares, shall be deemed personal property. . . ." Sec. 182.05, Stats.

"The stock of every stock corporation shall be represented by certificates signed by the president. . . ." Sec. 182.055, Stats.

Thus, although our statutes recognize that stock is issued only when money, labor, or property is received therefor, they do not recognize that stock is issued or that there is an "issue of securities" when new certificates are put out for the purpose of replacing lost certificates, or evidencing a sale or change in ownership of capital stock, or evidencing the breakup of a stockholder's interest in the corporation either by splitting up the number of shares of stock which he owns, or by issuing separate certificates for his separate shares of stock. The exchange of stock certificates by the utility is not in and of itself an issuance of securities. Such an exchange can constitute an issuance of securities only if in the process of the exchange some class of the corporation's stock is actually increased in

consideration of its actually receiving additional money, property, or services equal to the par value of the issue of stock. As in the case at bar no such consideration is to be received by the utility and there is to be no increase, or anything to be added to its capital stock, there is and legally can be no issuance of securities. The proposed new certificates only evidence the division of the then outstanding capital stock into units of smaller size. The capital stock itself amounting in the aggregate to $2,670,000 had all been previously issued pursuant to authority of the commission. The transaction involved in the split-up of the shares of common stock aggregating $2,670,000 in no way changed the stockholders' proportionate interest therein and in the corporation. Each stockholder owned exactly as much stock after the division as prior thereto, and no new stockholders were added thereby. Consequently, as upon the split-up there was no issuance of any additional common stock or any change in the utility's existing capitalization, there was no additional original "issue of securities" within the meaning of that term as used in sec. 184.10 (1), Stats. To the same effect are the decisions in relation to whether a split-up of outstanding shares of stock constitutes an issuance of securities, so as to be subject to the stamp tax imposed by sec. 800 of the 1917 Federal War Revenue Act. See *Bowers v. West Virginia Pulp & Paper Co.* (2d Cir.) 297 Fed. 225, affirming decision in 293 Fed. 144; *American Laundry Machine Co. v. Dean* (D. C.), 292 Fed. 620; *Trumbull Steel Co. v. Routzahn* (D. C.), 292 Fed. 1009; *Standard Mfg. Co. v. Heiner* (D. C.), 300 Fed. 252; *Cleveland Provision Co. v. Weiss* (D. C.), 4 Fed. (2d) 408. Likewise, state courts, in determining the powers of regulatory commissions, when their exercise thereof is dependent upon whether there is involved an issuance of securities, have come to the same conclusion, viz., issue means original issue. *Public Service Comm. v. Consolidated Gas, Elec. Light & Power Co.* 148 Md. 90, 129 Atl. 22; *People v. Liberty Light & Power Co.*

121 Misc. 424, 201 N. Y. Supp. 302. And state courts applying state franchise or excise taxes also have determined that split-ups of outstanding stock issues, are not taxable as issues. *O'Gara Coal Co. v. Emmerson*, 326 Ill. 18, 40, 156 N. E. 814, 823; *Interstate Iron & Steel Co. v. Stratton*, 340 Ill. 422, 172 N. E. 705; *Hood Rubber Co. v. Commonwealth*, 238 Mass. 369, 131 N. E. 201. These adjudications are precisely in point in the case at bar.

The commission in its declaratory ruling stated:

"It seems to us clear, therefore, that if nothing more were involved in the transaction which was before the commission . . . than the mere exchange of 3.75 shares of stock of a par value of $20 for each of the outstanding and already issued shares of stock of the par value of $75, there would be no creation of any new or different beneficial interest in the business and affairs of the Lake Superior District Power Company, and, consequently, no issuance of securities to which the fee prescribed by section 184.10 is applicable."

Thus the commission concedes that the split-up of the shares of common stock would be no "issuance of securities to which the fee prescribed by section 184.10 is applicable," if there were not involved as part of the transaction changes in the relative voting rights of the holders of the common and of the preferred stock. The commission's ruling was based on its theory that,—

"The result [of the multiplication of the voting rights of common stockholders due to split-up of common stock] is that neither the shares of preferred nor of common stock of the company, after the consummation of the transaction as approved, will be representative of exactly the same beneficial interest in the business and assets of the corporation as were the previously issued and outstanding shares of common and preferred stock. . . ."

However, in spite of this theory and its declaratory ruling, the commission did not seek to levy a fee on an issuance of preferred stock,—measured by the value of outstanding preferred

stock,—because the voting rights and consequent power of control are affected as between the common and the preferred stock.

In considering the above-quoted statement of the commission and its conclusion that there would be no issuance of securities but for a change in the relative beneficial interest of its stockholders, it must be noted that no material change was effected in the "beneficial interest" of any stockholder by the utility's amendment of the provisions in its articles of incorporation in relation to the number and par value and aggregate par value of its shares of common stock. Each holder thereof had the same interest in the corporation's property before and after the split-up. There was no change in the stockholder's rights upon liquidation, and no change in the dividend rates. Control of the company was not shifted from one class of stockholders to another. While the voting rights of the common stock were multiplied by the split-up, the common stock had more than a majority of votes before the change. The theory applied to this case by the commission would result in a reissuance of all classes of stock for the purpose of the fee imposed by sec. 184.10 (1), Stats., every time any change is made in any class of stock. The issuance of additional common stock would amount to the reissuance of all classes of outstanding preferred stock,—and *vice versa*. A change in the representation of any class of stock on the board of directors would constitute the reissuance of all stock outstanding, even though the stockholders are given the power under secs. 180.07 and 184.13, Stats., to modify their own rights at will. Manifestly, the theory of the commission does not sustain or warrant the conclusion that, by reason of amendments of the articles of incorporation, there was then any issue of stock, either common or preferred, which constituted an "issue of securities" to which the fee prescribed by sec. 184.10 (1), Stats., can be deemed applicable. It follows that the judgment under review must be affirmed unless the validity thereof is affected by

prejudicial error on the part of the court in making certain orders from which the commission also appealed.

The commission contends that the circuit court never acquired jurisdiction to review the commission's declaratory ruling for the reason that the instrument which the utility served on and filed with the commission on November 19, 1945, for the purpose of having a review of that ruling was designated "Notice of Appeal" rather than "Petition for Review." Sec. 227.16, Stats., provides that such "proceedings for review shall be instituted by serving a petition therefor." There was no claim that the instrument served did not fully comply in all other respects with the requirements of sec. 227.16, Stats. It was served within the time and upon the parties specified in that section; and throughout almost the entire proceedings in the circuit court, pursuant to the instrument, up to the rendition of the court's supplemental decision and judgment the error in nomenclature in designating the instrument "Notice of Appeal" did not deceive or confuse anyone, no one was prejudiced in any way by the form of the language used, and all parties proceeded on the assumption that the proceedings were properly before the court until the attorney general objected on the ground that the court never acquired jurisdiction to review the commission's declaratory ruling for the reason that the proceeding for review by the circuit court was instituted by an instrument designated "Notice of Appeal" rather than "Petition for Review." Upon the utility's motion, the court then allowed an amendment of the instrument, which did nothing but change its caption to "Notice of Appeal and Petition for Review," and make the minor changes in the body thereof which were required by that change of title; otherwise the original and the instrument as amended are identical in substance. In allowing the amendment the court stated,—

"We deem the formal substitution [of Petition for Notice of Appeal] unnecessary, but allow it. We do not look upon

the error, if any, in nomenclature, as at all fatal. The distinction between petition and notice in the instant case is of no importance, in our judgment. The petition does not, cannot, and need not set out anything substantially different than is in the notice."

Sec. 227.16, Stats., provides that "The petition may be amended, by leave of court, though the time for serving the same has expired;" and under the circumstances the court rightly ordered the amendment.

The commission also contends the circuit court was without power to enjoin *pendente lite* the commission from transmitting the utility's draft for $2,670 to the state treasurer as fees collected from the utility. The commission claims that the amount of the fee, exacted by it as prepayment, was the proper fee under sec. 184.10 (1), Stats.; that whether rightly or wrongly exacted, when so paid to the commission, such sum was paid to it as an arm or agency of the state of Wisconsin; that all of the funds which it has as the Public Service Commission of Wisconsin are funds of the state of Wisconsin; that sec. 14.68 (1), Stats., expressly commands the commission to turn those collections over to the state treasury; and that therefore a court is without power to suspend the operation or effectiveness of sec. 14.68 (1), Stats. In this case the purpose and conditions of the transaction between the commission and the utility in relation to its draft of $2,670 are definitely evidenced by statements in the utility's attorney's letter attached to the draft, and the commission's written receipt for the draft,—

"Received of Lake Superior District Power Company draft issued by the Union National Bank of Ashland, No. 25090, to the First National Bank of Chicago, Illinois, payable to the Public Service Commission of Wisconsin in the sum of $2,670 being for the balance of fees claimed to be due for the issuance of securities in the proceeding docketed 2–SB–244 and which are paid by said Lake Superior District Power Company under protest, as set forth in the letter of Aberg, Bell, Blake & Con-

rad, dated April 9, 1945, accompanying the delivery of said draft."

From those statements it clearly appears that the draft delivered to and received by the commission was deposited or paid under protest to be held by it until the questions raised in the pending proceedings for an administrative ruling under sec. 227.06, Stats., were finally determined by the commission or by any court on appeal. As the court's final judgment reversed the commission's declaratory ruling and substituted therefor a ruling to the effect that no fee or tax was payable by the utility, neither the commission nor the state treasurer has become entitled to retain or use the draft as payment for the fee which was wrongfully demanded by the commission. For that and other reasons stated in sustaining the contentions of the plaintiff in the actions brought against the commission by the Madison Gas & Electric Company, *post,* p. 59, 26 N. W. (2d) 285, and the Milwaukee Gas Light Company, *post,* p. 54, 26 N. W. (2d) 287, which are decided herewith, the circuit court did not err in granting the order for the injunction *pendente lite,* and in subsequently denying appellant's motion to reconsider that order, and deciding on the utility's applications for the injunction and also for final judgment that the decision to allow the injunction should be affirmed.

*By the Court.*—The judgment and the orders appealed from are affirmed.

RECTOR, J., took no part.