HERRO, as Trustee for himself and others, Appellant, v. NATURAL RESOURCES BOARD, an agency of the state of Wisconsin, Respondent.*

*No. 255. Argued November 5, 1971.—Decided December 2, 1971.*
(Also reported in 192 N. W. 2d 104.)

* Motion for rehearing denied, without costs, on February 1, 1972.

158

For the appellant there were briefs by *Foley & Lardner* of Milwaukee, attorneys, and *Herro, McAndrews & Porter, S. C.,* of Madison, of counsel, and oral argument by *Marvin E. Klitsner* of Milwaukee.

For the respondent the cause was argued by *Steven M. Schur,* assistant attorney general, and *W. Scott Van Alstyne, Jr.,* of Madison, of counsel, with whom on the brief were *Robert W. Warren,* attorney general, and *Charles A. Bleck,* assistant attorney general.

CONNOR T. HANSEN, J.   The trial court well described the posture of this case in stating, "The question which arises in this case, tried to the Court, involves not so much a dispute as to the facts but rather a dispute as to the interpretation of the law to be applied to those facts."

*Facts.*

Two parcels of land are involved in these proceedings, a 977-acre tract owned in fee by appellant, and a 1,591-acre tract in which appellant owns what can be described as an option to purchase. These parcels are part of a

larger tract initially acquired by the federal government
for the purpose of establishing the Bong Air Force Base.

In *Herro v. Wisconsin Federal Surplus Property De-
velopment Corp.* (1969), 42 Wis. 2d 87, 166 N. W. 2d
433, this court defined the property rights of appellant
in these two tracts and held that ch. 646, Laws of
1965, insofar as it purported to transfer the federal lands
to the state conservation commission (hereinafter com-
mission) was unconstitutional for failing to comply with
the necessary procedural requirements for condemnation.
March 10, 1967, relying upon the validity of ch. 646, and
pursuant to sec. 32.12, Stats., the board adopted a resolu-
tion of necessity to condemn appellant's interest in the
land. A professional appraiser was employed by the com-
mission, and as of August 1, 1967, appraised the 977-
acre tract at $390,000, stating that its highest and best
use was for agricultural purposes. The appraiser re-
jected appellant's proposal to develop the land for air-
port and industrial purposes as its highest and best use.
Thereafter, negotiations took place between the commis-
sion and appellant for the purchase of the latter's
interest, with offers by the commission of $350,000,
$360,000, and $400,000, between November 6, 1967, and
June 24, 1968. Appellant was willing to negotiate in the
area of $800,000.

April 17, 1969, the board employed the same appraiser
to update the appraisals of the 977-acre tract, and to
include appellant's interest in the 1,591-acre tract. The
new appraisals, as of June 1, 1969, ascribed a value of
$450,000 to the 977-acre tract, $675,000 to the 1,591-acre
tract, and $1,130,000 to the two tracts combined. The
appraisals were based on the conclusions that the high-
est and best use of the land was for agricultural pur-
poses, and the appraisal of the 1,591-acre tract was on
the value of the land itself as opposed to appellant's
interest therein. July 25, 1969, J. R. Smith, with the

approval of Lester P. Voigt, chief executive officer of the DNR, offered to purchase the interests of appellant in the property for $600,000, subject, however, to final approval by the board and by the governor. Appellant was given until August 4, 1969, to accept the offer. July 30, 1969, appellant was advised by the board that it would consider the necessity of condemnation proceedings at a meeting on August 14, 1969. Appellant rejected the offer of $600,000 on August 4, 1969, and indicated an intent to proceed with the development of the area. August 14, 1969, appellant appeared before the board and presented its proposal for the development of the area, reiterating a request that the board establish the fair market value of the 1,591-acre tract to enable appellant to exercise his option to purchase and begin development. The same day, the board adopted a formal resolution for condemnation of the interests of appellant. At the same time the board endorsed a legislative bill (593, S.) which provided for acquisition of the same lands by the state building commission and a study to determine the best public use of such lands. August 15, 1969, the board sought the approval of the governor for the institution of condemnation proceedings pursuant to sec. 20.914, Stats. The governor was advised by the board of appellant's rejection of the offer made on July 25th and the necessity for acquiring the land to preserve the contiguity of the tract. The board stated it was also endorsing the legislative bill because it recognized a difference of opinion as to the highest and best use of the land and was willing to cooperate with other state agencies on this matter. The governor approved the resolution on September 17, 1969. However, the governor denied the board's request to retain private counsel in the condemnation proceedings.

Subsequently, the DNR turned the matter over to the attorney general's office where it was assigned

to Charles Bleck. After reviewing the prior appraisals, Bleck informed Smith that he felt they were not accurate and suggested employing new appraisers. Bleck felt that the appraisals were "ridiculous" because they were based on the theory that the highest and best use was for agricultural purposes when the land had been compacted and filled with gravel in preparing it for airport purposes. However, there was testimony that the federal government had restored some of the topsoil and appellant had rented out the land for five or six years for purposes of farming. Bleck recommended F. E. Gutschenritter and A. W. Mayo as appraisers, and after these individuals were approved by Smith, they made two separate appraisals. Gutschenritter concluded the highest and best use of the land was for agricultural purposes and appraised the fair market value of the 977 acres at $135,000 as of November 1, 1969. Mayo concluded the highest and best use of the land was for airport and industrial development and appraised the fair market value of the 977 acres at $142,000, as of November 24, 1969. Both appraisers concluded that the interest of appellant in the 1,591-acre tract had no market value. Bleck testified he had discussed with Gutschenritter and Mayo, prior to the time the appraisals were made, his own approach in the valuation of the property. He informed them that under the agreement of appellant, the development of the property constituted a situation comparable to zoning restrictions or a restrictive covenant and that this factor should be considered in making the appraisals.

After this court's decision in *Herro v. Wisconsin Federal Surplus Property Development Corp., supra,* appellant met with representatives of the attorney general's office and Judge CHARLES in an effort to reach a final judgment in accordance with the decision. Meetings held on September 19th, October 10th and November 14th, 1969, resulted in general consensus that the board

proceed with the condemnation action prior to any final determination of the judgment. Appellant testified that the thrust of the meetings was to proceed with condemnation expeditiously, acknowledging however, that if condemnation was abandoned, the value of the 1,591-acre tract would be determined and appellant would exercise his option and proceed with the development of the land.

October 25, 1969, proposals were submitted on behalf of appellant for a stipulation, findings of fact, conclusions of law and a judgment. The proposed stipulation acknowledged the resolution of the board in regard to condemnation proceedings, the approval by the governor, and the fact that the attorney general was proceeding to initiate a condemnation action. The proposed findings of fact recited the requirement that the board make a jurisdictional offer by November 1, 1969. The date was changed to December 1, 1969, in a revised draft of these proposals. The documents were never executed.

November 28, 1969, Voigt authorized the attorney general's office to proceed with a jurisdictional offer of $135,000 although neither Voigt nor Smith had examined the Gutschenritter or Mayo appraisals prior to this time. Smith acknowledged that the extent of the participation of the DNR in the jurisdictional offer and negotiations subsequent to the determination of necessity consisted only of the execution of documents of authorization. November 28, 1969, after receiving an authorization from Voigt, Bleck presented the offer in person to appellant. Bleck testified that he was somewhat embarrassed in making the offer in view of the previous offer of $600,000, but testified he went into great detail in explaining the theory of law upon which the appraisal was based. Appellant indicated he was not prepared to make a counteroffer at that time and asked Bleck to make another offer. Bleck replied he would not bargain with himself. Appellant testified

Bleck presented the offer on a "take it or leave it" basis. A jurisdictional offer in the amount of $135,000 was mailed the same day and received by appellant on December 1, 1969.

Hearing before the condemnation commissioners proceeded on March 23, 1970, and on June 19, 1970, the condemnation commissioners filed an award in favor of appellant in the amount of $244,250 for the 977 acres and nothing for the option rights in the 1,591-acre tract.

Additional facts will be set forth in considering the issues raised on this appeal.

## Issues.

The appellant contends the following alleged errors constitute grounds for reversal:

(1) Lack of good faith in the determination of necessity.

(2) Failure to negotiate.

(3) Deception in obtaining approval of the Governor.

(4) Publication of jurisdictional offer.

(5) Failure to timely make the award.

### Lack of good faith in the determination of necessity.

We consider the most significant point raised on this issue to be the fact that at the same meeting at which the board adopted the resolution of necessity, it also went on record supporting the pending legislation which provided for a study by another state agency to determine the best use of the land.

At a meeting of the land committee of the board on August 14, 1969, discussion was held concerning appellant's land and the condemnation thereof in accordance with a previously formulated plan to develop the area

into a wildlife refuge and recreation area. At the board meeting which followed, it was proposed to condemn the land by adoption of a resolution which declared that the private lands were needed for conservation purposes. One of the members expressed a desire to condemn the land, parcel it off, and thereafter determine its ultimate use. Legal counsel advised the board that the sole question was whether the board wanted to condemn the land and use it for conservation purposes, and that the resolution of necessity must so state; if not, the land would have to be transferred to appellant pursuant to the prior agreement. After discussion with appellant concerning future negotiations relating to the proposed condemnation, the board passed a resolution declaring the necessity of obtaining the lands for purposes of recreation and a wildlife refuge. The board then endorsed Senate Bill 593 providing for acquisition of the same lands by the state building commission and a study of the best possible use of such lands. At trial, Smith testified it was his understanding as well as Voigt's, that condemnation would proceed, letting the future determine the ultimate use of the land. He further testified that he informed the governor's representatives that this was the posture of the department on the matter.

Appellant attacks the finding of necessity for conservation purposes, contending the real reason for the condemnation was that it was advantageous to the state to take the lands immediately to avoid being forced to convey them to appellant. Sec. 23.09 (7) (d), Stats. 1967, declares the purposes for which land may be acquired through condemnation by the DNR:

"(d) *Lands, acquisition.* Acquire by purchase, condemnation, lease or agreement, and receive by gifts or devise, lands or waters suitable for the purpose hereinafter enumerated, and maintain the same for the said purposes:

"1. For state forests for the purpose of growing timber, demonstrating forestry methods, protecting watersheds or providing public recreation.

"2. For state parks for the purpose of preserving scenic or historical values or natural wonders.

"3. For public shooting, trapping or fishing grounds or waters for the purpose of providing areas in which any citizen may hunt, trap or fish.

"4. For fish hatcheries and game farms.

"5. For forest nurseries and experimental stations."

In *Banach v. Milwaukee* (1966), 31 Wis. 2d 320, 327, 328, 143 N. W. 2d 13, it was stated:

"Plaintiffs are in error contending that the motives of the members of the common council are material to a judicial review of the validity of the council's determination of the necessity for the taking of their land. Such determination of the necessity of taking is legislative in character. Therefore, the motives which prompt a legislative body, such as a city council, in performing such a legislative function are not within the field of judicial scrutiny.

"While determination of necessity of taking made by the body authorized by the legislature to make it is not beyond the pale of judicial review, such review operates within vary narrow limits. In *Swenson v. Milwaukee County* this court quoted with approval a statement from American Jurisprudence that courts normally will not disturb such a determination in the absence of fraud, bad faith, or gross abuse of discretion. This court has held that the determination made of the necessity of taking is beyond question if there is any reasonable ground to support it."

The determination of necessity was upheld in *Banach* where the city took condemned land of the plaintiff for the extension of an existing street. The court stated that in order to find that the taking would serve no purpose, "the undisputed evidence would have to establish that the opening of the street would serve no useful purpose either presently or in the reasonably foreseeable future."

In *Schumm v. Milwaukee County* (1951), 258 Wis. 256, 266, 45 N. W. 2d 673, the county attempted to condemn lands on which a private corporation would build a war memorial pursuant to an agreement between the county and the corporation. The contract contained certain contingencies which might have prevented the development of the site for a public use. The court, in upholding a challenge to the condemnation, held that "[p]ublic use under this 'contract' is thus made conditional but private property may not be condemned unless the public use in it is to be unequivocal and absolute except for necessary and reasonable regulation in the use and enjoyment thereof."

In *Swenson v. Milwaukee County* (1954), 266 Wis. 129, 133, 63 N. W. 2d 103, it was stated:

"No doubt a court would find it necessary to interfere to prevent an abuse of discretion by an attempted taking of land in utter disregard of the necessity of its use, and would not consider itself bound by a mere legislative declaration of such purpose as a means of concealing a design to take it for an illegal purpose; that is not the situation here, however."

In the instant case, there is evidence that progress had already begun on surrounding lands in establishing a wildlife refuge and public recreation facilities. This fact provides a reasonable basis for the finding of necessity to condemn the lands of appellant for conservation purposes. It is urged that by endorsing Senate Bill 593 there was a recognition by the board that conservation perhaps might not be the highest and best use of the land. If the proposed study provided for by the then pending legislation concluded that any other use of the property would be preferable, the board would accede to legislative pre-emption. There is no requirement that the board's finding of necessity for a public purpose be immediate or the most desirable. In 1 Nichols, *Eminent Domain* (3d ed.), p. 553, sec. 4.11[2], it is stated:

". . . The expediency of constructing a particular public improvement and the extent of the public necessity therefor are clearly not judicial questions; but it is obvious that, if property is taken in ostensible behalf of a public improvement which it can never by any possibility serve, it is being taken for a use that is not public, and the owner's constitutional rights call for protection by the courts."

As the trial court noted, the DNR could not use the lands for any other purpose than those allowed by sec. 23.09 (7) (d), Stats. Absent a determination by the legislature that some other use of the land constituted the best public use of the land, it must be assumed that the DNR would proceed in developing it for conservation purposes.

We are not impressed with argument that during the discussion that preceded the adoption of the resolution, one of the board members inquired as to whether the resolution could be adopted without specifically providing that the lands be used for specified conservation purposes. Neither do we deem it to be significant that counsel came to the board with a previously prepared resolution of necessity.

### Failure to negotiate.

In condemning appellant's land, the DNR was required to comply with sec. 32.06, Stats. The first two subsections of that statute prescribe the necessary steps to be taken prior to making a jurisdictional offer:

"32.06 **Condemnation procedure in other than highway, etc., matters.** The procedure in condemnation in all matters except streets, highways, storm or sanitary sewers, watercourses, alleys and airport acquisitions, acquisitions under chapter 275, laws of 1931, as amended (Kline Law), acquisitions under ch. 157, and acquisitions under ch. 197, shall be as follows:

"(1) DETERMINATION OF NECESSITY OF TAKING. The necessity of the taking shall be determined as provided in s. 32.07.

"(2) APPRAISAL. The condemnor shall cause at least one (or more in his discretion) appraisal to be made of the property proposed to be acquired. In making any such appraisal the appraiser shall confer with the owner or one of the owners, or his personal representative, if reasonably possible.

"(2a) AGREED PRICE. Before making the jurisdictional offer provided in sub (3) the condemnor shall attempt to negotiate personally with the owner or one of the owners or his personal representative of the property sought to be taken for the purchase of the same. In such negotiation the condemnor may contract to pay the items of compensation enumerated in ss. 32.09 and 32.19 where shown to exist."

The issue presented is whether the board attempted to negotiate with appellant after a determination of necessity had been made.

Ch. 32, Stats., provides the exclusive procedure in condemnation actions. The statutes are in derogation of the common law and therefore are to be strictly construed. *Madison v. Tiedeman* (1957), 1 Wis. 2d 136, 83 N. W. 2d 694; *Schroedel Corp. v. State Highway Comm.* (1967), 34 Wis. 2d 32, 148 N. W. 2d 691. A failure to negotiate, as required by the statute, has been held to be a jurisdictional defect. *Kultgen v. Mueller* (1958), 3 Wis. 2d 346, 88 N. W. 2d 687; *Arrowhead Farms, Inc. v. Dodge County* (1963), 21 Wis. 2d 647, 124 N. W. 2d 631. It is necessary, therefore, to consider the meaning of the term "negotiate."

In 6 Nichols, *Eminent Domain* (3d ed.), p. 85, sec. 24.62 [1], it is stated that:

". . . unless there is a *bona fide* attempt on the part of the condemnor to induce the owner to sell the land at a reasonable figure, the condition under which the power is granted is not fulfilled, and in such case any attempted exercise of eminent domain is unauthorized and consequently void and of no effect. . . ."

As to what constitutes a good faith attempt to purchase, the author states, at pages 92–96, sec. 24.621:

". . . While no general rule can be set forth, it has been held that a reasonable effort must be made in good faith to reach an agreement. A merely formal or perfunctory attempt to purchase is not sufficient to comply with the requirement of the statute, nor is a formal offer and refusal necessary to lay a foundation for the suit. Prolonged negotiations are likewise unnecessary; compliance with the statutory requirement is had when the negotiations have proceeded sufficiently to demonstrate that agreement is impossible. Such impossibility to agree does not mean impossibility to agree upon any price, no matter how large, but impossibility due either to the owner's unwillingness to sell at any price or to sell only at a price which the condemnor deems excessive. However, mere difference in amount between the parties is not determinative of whether a *bona fide* attempt to agree has been made. If it becomes apparent that no agreement can be made at a price satisfactory to the condemnor, the effort to agree may be dropped.

". . . If the corporation desiring the property submits an offer to the owner and upon his refusal to accept the same asks for a counter-offer from him, and he refuses to name any figures or names an unreasonable one, it is sufficient, and it has been held that the bare submission of an offer to the owner to buy the property at a certain price and his refusal is enough negotiation to satisfy the statute. Even when the owner does not definitely reject the offer, but says he will give his answer within a specified time, the condemnor need not wait, but may institute proceedings at once. . . ."

In *Wampler v. Trustees of Indiana University* (1961), 241 Ind. 449, 456, 172 N. E. 2d 67, 71, it was stated:

"What constitutes a 'good faith' or 'bona fide' offer to purchase? Each case must be determined in light of its own particular circumstances. However, the authorities generally indicate that where there is disagreement regarding the value of property, if a reasonable offer is made honestly and in good faith and a reasonable effort has been made to induce the owner to accept it, the re-

quirements of the statute for an offer to purchase have been met. 18 Am. Jur., Eminent Domain, sec. 319, p. 962; . . ."

In the instant case, Bleck was given authority by Voigt to present appellant with an offer of $135,000. The trial court correctly found Bleck had an honest belief as to the value of the property which was based on a competent appraisal. The trial court also found appellant rejected the offer and refused to make any counteroffer. On the basis of these facts, the court found the statutory requirement had been fulfilled.

In our judgment the statute does not contemplate an impossibility to purchase at any price, however large, but merely an unwillingness on the part of the owner to sell only at a price which in the condemnor's judgment is excessive. In such an event, the attempt to agree need not be pursued further than to develop the fact that an agreement to purchase is not possible at any price which the condemnor is willing to pay. 27 Am. Jur. 2d, *Eminent Domain*, p. 256, sec. 388.

In this case the board adopted the required resolution of necessity. The DNR then proceeded with the condemnation proceedings. It authorized Bleck to employ appraisers, and the executive officer of the DNR authorized the jurisdictional offer. We conclude that there was no unauthorized delegation of authority by the board or any action by employees of the DNR or the attorney general's office which would constitute any unauthorized usurpation of powers vested solely in the board. We further conclude that the negotiations carried on by Bleck were, under the circumstances present in this case, in good faith.

### *Approval of the Governor.*

After judgment, the appellant moved the trial court to set aside its decision and to take additional evidence,

or in the alternative for a new trial upon newly discovered evidence.

The evidence was a personal letter from the Governor to one of the interested parties represented by appellant. The letter in part states:

". . . There is a bill (593 S) presently pending before the legislature which proposes to examine the merits of future use [of the Bong area], and I was persuaded to sign the authorization for condemnation with the understanding that this matter would be fully explored as to its future potential before the further development for recreational purposes."

The basis for this motion is the assertion that the personal letter written by the Governor reflects that he was persuaded to sign the authorization for condemnation with the understanding there would be further investigation as to the highest and best use of the land before development by the DNR for recreational conservation purposes.

Assuming, without so deciding, that the letter would be admissible evidence, we are of the opinion that the trial court properly denied the motion because it cannot be said that it is reasonably probable that the newly discovered evidence would produce a different result on a new trial. *Estate of Javornik* (1967), 35 Wis. 2d 741, 746, 151 N. W. 2d 721.

Appellant contends the letter is proof that the DNR misrepresented its intention to the Governor in acquiring the land because under sec. 20.914, Stats., authorization must be preceded with a determination by the Governor that the land is required for the purpose proposed:

"20.914 **Acquisition of land and buildings.** All appropriations made by law for the purchase of land and for the construction of new buildings or additions to existing buildings shall be expended only in accordance with the following conditions:

"(1) LAND PURCHASE, GOVERNOR'S APPROVAL. No land shall be purchased and no contract or contracts entered

into for the purchase of any land by any state agency until complete estimates of the total cost thereof shall have been submitted to and approved in writing by the governor, who shall withhold such approval until he satisfies himself by a personal investigation or by such other means as he adopts, that such land is required for the purpose proposed, and can be purchased for the sum proposed out of the appropriations made for such purpose."

The declaration of necessity for a specific purpose does not necessarily mean that the need is immediate or necessarily the most desirable from every viewpoint. The board could not use the lands taken for any purpose other than those set forth by sec. 23.09 (7) (d), Stats. Any change in use could not be accomplished by the board, but only by an act of the legislature. Therefore, the determination by the board and its representation to the Governor that it was willing to forego immediate development of the land for conservation purposes, pending possible developments under Senate Bill 593, does not constitute proof of bad faith or fraud.

*Publication of jurisdictional offer.*

December 2, 1969, one day after appellant received the jurisdictional offer, The Milwaukee Journal reported that the state had made a jurisdictional offer to the appellant in the amount of $135,000. The source of the information was Richard C. Kienitz, a reporter for the newspaper, who was then at a meeting of the Great Lakes Fishery Commission held in Michigan, which was attended by Voigt and Smith. Kienitz testified he overheard information about the jurisdictional offer in conversations. Apparently the only conversation he overheard from anyone associated with the matter was either Voigt or Smith, but he did not recall receiving information as to the amount of the award from them.

The hearing before the Kenosha county condemnation commission was held March 23 through the 27th, 1970.

Secs. 32.08 (6) (a) and 32.06 (10), Stats., prohibit disclosing the jurisdictional offer to the condemnation commission or to the jury. Sec. 32.06 (7), Stats., declares that the *petition* shall be a nullity if it discloses the amount of the jurisdictional offer. Appellant now asks the court to vitiate the entire proceeding due to the fact that the newspaper article of December 2, 1969, contained the amount of the jurisdictional offer. The issue is raised for the first time on appeal. The appellant has not shown, and we can find nothing in the record to suggest, that the Kenosha county condemnation commission had any knowledge of the amount of the jurisdictional offer or was in any way influenced by the newspaper article in its decision in making the award. We do not consider this alleged error grounds for reversal.

*Failure to make timely award.*

Sec. 32.08 (6) (b), Stats., requires the condemnation commission to make and file a written award with the clerk of court, specifying the property taken and the amount of the award, within ten days after the hearing. In this case the five-day hearing concluded on March 27, 1970, and the award was filed June 19, 1970.

Appellant contends that failure to file the award within the ten-day limitation, is, in effect, jurisdictional and that the commission has lost jurisdiction to make an award unless it does so within the time prescribed by statute. We do not agree.

The effect of a "late" filing of a decision, order, or award of a state agency, pursuant to a statutory requirement, has been before this court and such statutory periods have been held to be directory rather than jurisdictional. In *Muskego-Norway C. S. J. S. D. v. W. E. R. B.* (1967), 32 Wis. 2d 478, 485c, 145 N. W. 2d 680, 147 N. W. 2d 541, 151 N. W. 2d 84, 151 N. W. 2d 617, it is stated:

"In *State v. Industrial Comm.* [(1940), 233 Wis. 461, 289 N. W. 769] this court considered the problem of whether a time limitation on an administrative agency was mandatory or directory. The court stated a guiding criterion as follows:

" '. . . [A] statute prescribing the time within which public officers are required to perform an official act is merely directory, unless it denies the exercise of power after such time, or the nature of the act, or the statutory language, shows that the time was intended to be a limitation.' "

The statute here under consideration makes no provisions for any consequences resulting from failure to timely make and file the award. Furthermore, in this case, we are unable to see how the appellant was in any way prejudiced by the late filing of the award. While the late filing of an award by a condemnation commission is not to be condoned, it does not necessarily operate to deprive the condemnation commission of jurisdiction.

Appellant's last contention is that the trial court erred in excluding an intradepartmental memorandum as not relevant to the issues of good faith negotiation and submission of a good faith jurisdictional offer. The memorandum contains suggestions by the prior appraiser (Lieberman) that if condemnation were to occur emphasis should be placed on the value of the land paid by appellant and also that it would be advisable to find experts to testify to certain valuations of the land. Appellant suggests that Gutschenritter and Mayo used the price paid by appellant, ten years prior to the taking, as the principal criterion in appraising the lands. However, appellant has failed to demonstrate that the memorandum was relied upon by Gutschenritter or Mayo in their appraisals. Absent such a showing, it was not an abuse of discretion for the trial court to refuse the exhibits.

*By the Court.*—Judgment and order affirmed.