HERRO, as Trustee for himself and others, Appellant, v. DEPARTMENT OF NATURAL RESOURCES, Respondent.

*No. 439. Argued March 5, 1975.—Decided March 28, 1975.*
(Also reported in 227 N. W. 2d 456.)

408

For the appellants there were briefs by *Foley & Lardner* of Milwaukee, attorneys, and *DeWitt, McAndrews & Porter, S. C.* of Madison, of counsel, and oral argument by *Marvin E. Klitsner* of Milwaukee.

For the respondent the cause was argued by *Charles A. Bleck*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

CONNOR T. HANSEN, J. The real estate sought to be condemned by the DNR in this proceeding has been the subject matter of two previous appeals to this court. *Herro v. Wisconsin Federal Surplus Property Develop-*

*ment Corp.* (1969), 42 Wis. 2d 87, 166 N. W. 2d 433; *Herro v. Natural Resources Board* (1971), 53 Wis. 2d 157, 192 N. W. 2d 104.

The sole issue in the present action was the determination of the fair market value of the land and interest being condemned.

The land involved was part of the proposed Bong Air Force Base which had been abandoned by the federal government in 1959. At that time the federal government declared the land to be surplus federal land and the Wisconsin state legislature created the Wisconsin Federal Surplus Property Development Commission (hereinafter Bong Commission) to investigate and seek a use for the property. The Bong Commission was authorized to and did establish a private corporate instrumentality (hereinafter the Bong Corporation) to acquire and develop the land in coordination with private developers.

The Bong Commission obtained the services of a professional planner, Max Anderson, who in October, 1961, submitted a general plan (hereinafter Bong plan) for the development of the Bong lands. The plan called for the land to be developed as an integrated community with some conservation and recreation land, an airport facility, an industrial development, and a residential community.

In January, 1964, the Bong Commission publically advertised the sale of part of the land which was to be privately developed under the Bong plan. The Bong Commission was to buy the land from the federal government and they were to resell the land to the private developer at the same price. The appellant, who had had prior negotiations with the Bong Commission for purchasing the lands, submitted a new proposal on January 27, 1964. The proposal was accepted by the Bong Commission, and on February 28, 1964, an agreement was signed which envisioned a ten-year lease with option to purchase 977 acres and an option to purchase the remaining 1,591 acres at fair market value as well as a right

of first refusal on the same land. For its part, the appellant agreed to advance money to the Bong Commission, which was without funds, to enable it to purchase the land from the federal government. The appellant further agreed to cooperate with the Bong Commission with the development of the land in conformity with the Bong plan.

In 1965, the Bong plan, as a broad outline of the development, reached its final form, and called for the building of a model city encompassing an area much larger than just the Bong lands. The appellant obtained the services of various engineering and planning firms to develop a more detailed schedule for accomplishing the objectives of the larger plan.

The appellant, pursuant to the February 28, 1964, agreement, advanced the funds for purchase of the 977 acres on an installment basis. In September, 1969, they paid the balance due and received a deed to the property. The total price was $94,715, plus some undisclosed amount of interest. In August, 1969, the appellant exercised his option to purchase the remaining 1,591 acres at fair market value. As the DNR had already decided to condemn the appellant's interest, the option land was never valued and had not been conveyed as of the date of the taking, December 29, 1969.

We consider the following to be the issues presented on this appeal:

1. Did the trial court err in failing to grant appellant's motion for judgment notwithstanding the verdict?

2. Did the trial court abuse its discretion in failing to set aside the amount awarded by the jury as being inadequate and in failing to grant a new trial?

*Judgment notwithstanding the verdict.*

The appellant contends that his motion for judgment notwithstanding the verdict should have been granted

for the reason that upon all of the credible evidence and upon all reasonable inferences to be drawn therefrom, the appellant was entitled to an amount substantially above the award made by the jury. He asserts, as part of this contention, that the testimony of DNR's experts was improperly admitted over his objection and should be disregarded in determining what constitutes the credible evidence.

We are of the opinion that judgment notwithstanding the verdict is an improper motion to raise these issues. A motion for judgment notwithstanding the verdict admits for the purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted the moving party on grounds other than those decided by the jury. *Hennington v. Valuch* (1965), 27 Wis. 2d 130, 133 N. W. 2d 824; *Shumway v. Milwaukee Athletic Club* (1945), 247 Wis. 393, 20 N. W. 2d 123; *Volland v. McGee* (1941), 236 Wis. 358, 294 N. W. 497, 295 N. W. 635. The motion does not raise the issue as to whether there is sufficient evidence to support the verdict and the application may not be granted on the ground that the verdict is against the great weight of the evidence. *State v. Escobedo* (1969), 44 Wis. 2d 85, 90, 91, 170 N. W. 2d 709. While not challenging the sufficiency of the evidence to support the facts found in the verdict, it may be used to challenge whether the facts found in the verdict are sufficient to permit recovery. *Wozniak v. Local 1111 of UE* (1973), 57 Wis. 2d 725, 205 N. W. 2d 369; *State v. Escobedo, supra,* page 90. The purpose of the motion is to avoid a new trial and to secure a final judgment in favor of the movant. *State v. Escobedo, supra,* page 91. It is generally held that judgment notwithstanding the verdict is not the proper remedy where there are defects in the evidence which can be remedied by a new trial. Thus it is said that neither the admissibility of evidence nor its sufficiency may be challenged

by the motion. 46 Am. Jur. 2d, *Judgments*, p. 391, sec. 117; 49 C. J. S., *Judgments*, p. 165, sec. 60.

### New trial.

The appellant also moved to have the verdict set aside and a new trial granted in the interest of justice with the court giving DNR the alternative of paying the appellant $600,000 and $21,500 for the 977 acres and the option, respectively. The grounds for the motion included those asserted under the motion for judgment notwithstanding the verdict and additionally included allegations of prejudicial error regarding certain evidentiary rulings and the propriety of DNR's closing argument to the jury.

The trial court treated the motions in this case as asserting both a claim of prejudicial error and insufficiency of evidence to sustain the amount of the verdict.

The rules for reviewing the sufficiency of the evidence in a condemnation case have been fully set forth by this court in *James Madison Development Corp. v. State* (1970), 48 Wis. 2d 629, 632, 633, 180 N. W. 2d 597, quoting from *Weeden v. Beloit* (1966), 29 Wis. 2d 662, 139 N. W. 2d 616, as follows:

" 'In reviewing a jury verdict this court need only consider that evidence which supports the verdict. It is also clearly a rule of this court that a verdict should not be disturbed "if there is any credible evidence which under any reasonable view fairly admits of an inference that supports the jury's finding." This approach is especially applicable when, as in the instant case, the trial court approved of the verdict. That this approach is equally applicable in condemnation cases is evident from the following statement made by this court in affirming a jury verdict on a condemnation award:

" ' "We must be mindful that the court below passed upon the matter under circumstances more favorable for arriving at a just result than are afforded here. To disturb the result would require overriding the conclusion of the jury, reinforced by that of the trial judge."

" 'The instant case also presented the jury and the trial court with considerable conflicting expert testimony. It was the duty of the trier of the fact to determine the credibility of the witnesses and resolve the conflicting testimony. This rule is equally applicable in condemnation cases.' "

As in the *James Madison Case* and the *Weeden Case*, the jury here heard conflicting expert testimony as to the value of the interests in question and the proper methods and factors to be used and considered in arriving at the value. The jury's verdict was reviewed and approved by the trial court and should not be disturbed on review where it is clear that the value arrived at is well within the range of values placed in evidence, and where there is credible evidence to sustain the jury's finding. *James Madison Development Corp. v. State, supra,* page 633; *Besnah v. Fond du Lac* (1967), 35 Wis. 2d 755, 759, 151 N. W. 2d 725.

The appellant presented four witnesses who gave their expert opinion as to value. David Carley, president of Inland Steel Development Corporation, a resident of Madison and former chairman of the Bong Commission, testified that the land was worth a minimum of $1,000 per acre excluding the value of improvements on the land. Carley did not give an opinion as to the value of the option. Robert Gladstone, president of a Washington, D. C., economic consulting firm, who prepared a feasibility study of the plan for the appellant, testified that the land and the option were worth between $2,500,000 and $3,000,000, depending on the price set for exercising the option. Gladstone had experience in evaluating new town developments. His opinion was based in part on engineering studies and land value studies prepared by Herbert Foth of Green Bay and Howard M. Frierdich of Milwaukee. Frierdich, a real estate appraiser who operates his own consulting firm, also testified for the appellant. He stated that the value of the 977 acres plus the option was

$2,550,000. Finally, the appellant, Norman Herro, opined that the value of the land and option, assuming the Bong plan were the highest and best use, would be $2,500,000. Assuming some other use, the land would be worth $650 per acre. Of this $2,500,000, the option was worth $1,200,000 according to Herro's view.

The respondent presented the testimony of three expert witnesses. Robert E. Anderson, an experienced real estate broker and appraiser from Eau Claire, and a teacher of appraisal plus an author of many publications dealing with appraising theory, made two appraisals. First, assuming that the agreements between the appellant and the Bong Commission required that the Bong plan be developed, he opined that the land was worth $210,000 and the option worth $8,000. Second, assuming that the appellant was not required to develop the Bong plan and could use the land for agricultural, residential and recreational purposes, the value of the land was $310,000. In this latter event Anderson believed that the option would be worth more than $8,000, but he did not specify an exact amount. Arthur W. Mayo, a real estate appraiser from Waukesha, and Francis Gutschenritter, a real estate appraiser from Oconomowoc, set the value on the 977 acres at $142,000 and $135,000, respectively, and neither attached any value to the option.[1]

The major difference of opinion between the appellant's witnesses and DNR's witnesses involved whether the Bong plan was feasible and, therefore, whether it was the highest and best use of the land. The appellant

---

[1] In the instant case the testimony of the purported expert appraisers of the respective parties as to the fair market value of the land to be condemned ranged from a low value of $135,000 to a high value of $3,000,000. The jury awarded the appellant $308,950. Sec. 907.06, Stats., Wisconsin Rules of Evidence, 59 Wis. 2d Rp. 215, effective January 1, 1974, provides that a judge may appoint expert witnesses of his own selection and sets forth the procedure for doing so.

suggests that DNR's appraisers were not sufficiently qualified to give an opinion on the feasibility of the project. However, objection was not made at the trial as to a lack of proper expert qualifications and is thereby waived. However, DNR presented the testimony of Harlan E. Clinkenbeard, a professional planner with the Southeastern Wisconsin Regional Planning Commission, who stated that Bong had been considered as a possible satellite city, but rejected as unfeasible. DNR also presented testimony of airport planning and engineering experts, Leo C. Bussan and William Hanifan, who opined that the feasibility study for the Bong plan was based on erroneous assumptions and inaccurate or incomplete data and that the plan was not feasible.

The appellant also contends that no weight should attach to DNR's witnesses' opinions as to feasibility because they essentially refute the findings of the Bong Commission, a state agency, that the plan was feasible.

The arguments of the appellant go to the credibility of the state's witnesses and the weight to be given their testimony. These questions are for the jury to determine. *Weeden v. Beloit, supra,* page 666.

The appellant also contends that the testimony of DNR's three expert appraisers was of no probative value and was erroneously admitted. Their opinions, the appellant asserts, were depressed because of the erroneous assumption that the appellant was obligated to develop the land in accordance with the Bong plan. As these appraisers did not believe the plan to be feasible, they viewed it as a burden on the land. The appellant asserts that he was only required to follow the Bong plan if the plan was feasible. Therefore, if the plan was not feasible, it could not be deemed a burden or a restriction on the use of the land.

As applied to the testimony of Anderson, this argument is not applicable as to his higher appraisal which

was based on the assumption that the appellant was not required to develop the lands in conformity with the Bong plan. The view of Mayo and Gutschenritter was that the restrictions were the same as when the appellant purchased the land, and as the plan was not feasible then or on the date of taking, a willing purchaser would only pay the amount the appellant paid, with some increase compensating for the general rise in land values over the time.

The appellant's proposal of January, 1964, to purchase the land contained the following relevant statement:

"It is the intention of X Group that the development program be initiated promptly and pursued vigorously with the close cooperation of the Wisconsin Federal Surplus Property Development Commission and your Corporation. Such development will be conformable, as nearly as possible, to the broad plan outlines laid down by the Commission consultants as of this date and in the future."

This proposal was accepted by the Bong Commission and on February 28, 1964, the Bong Corporation and the appellant entered into an agreement which provided in relevant part:

"6. The Developer agrees, to the maximum extent feasible, to cooperate with the Corporation and to conform to the long-range planning and land development program being developed by the Federal Surplus Property Development Commission, and to join in deeds, mortgages, plats, restrictive covenants and such other instruments as may be deemed necessary or expedient from time to time in the furtherance of that program."

In both the Lease with Option to Purchase agreement (977 acres) and the First Right of Purchase agreement (1,591 acres), executed on May 5, 1965, the parties expressed their desire to accomplish the Bong plan and

agreed that "those restrictions are covenants running with the land binding upon the Purchaser, his heirs, personal representatives, successors and assigns." The restrictions referred to were those contained in the plan "A New City at Brighton, Wisconsin," as incorporated into the agreement by reference.

The appendix to the May, 1965, agreements provided that the restrictions of the plan could be amended by mutual consent of the parties where they proved to be in error or out of harmony with the general purposes of the plan. The deeds which were executed in September, 1969, contain the following restrictions:

"All subject to easements of record, and further subject to the property being put to a use consistent with the general objectives developed by the Wisconsin Federal Surplus Property Development Commission. This restriction shall cease to have any force or effect as to any described parcel of the above land 60 days after the recording of an affidavit by grantee, his successors or assigns stating that the proposed use of said described parcel was submitted in writing to the Governor of the State of Wisconsin and was approved by said Governor; or that such use was not disapproved in writing by said Governor as being inconsistent with said general objectives, within 30 days after its submission; and that said described parcel is to be developed, leased, sold or otherwise conveyed in accordance with said proposed use. In any event, said restriction shall cease to have any force or effect twenty-five (25) years after date of this deed."

Without objection by either party, the trial court instructed the jury on this issue as follows:

". . . You are instructed that under these agreements there were no specific time limits within which the condemnee, Herro, had to develop the Bong Base in compliance with the long range Bong Commission plan. You are instructed that under these agreements Herro was free to use the land on an interim basis for agricultural and other purposes so long as these purposes were not inconsistent with the long range Bong Commission plan,

until such time as Herro deemed it expedient to develop the property in accordance with such plan."

In view of the provisions of the documents, this instruction was an accurate conclusion of law as to the effect and extent of the restriction to follow the Bong plan. As such, the appellant's view that if the plan were not feasible, he was free to unilaterally ignore it without limitation, is incorrect. A question of fact was presented as to how a willing purchaser would value the land, taking into consideration the likelihood of having the restrictions removed. While there was testimony that the Bong Commission regarded the Bong plan as flexible in terms of boundaries and the proposed size of the airport there was no testimony that the developer was to be given a free hand to do whatever he wished regardless of whether the desired use conformed to the plan.

Every element which affects value and which would influence a prudent purchaser should be considered. *Volbrecht v. State Highway Comm.* (1966), 31 Wis. 2d 640, 646, 143 N. W. 2d 429; 4 Nichols, *Eminent Domain* (3d ed. rev. 1974), p. 12–15, sec. 12.1. The valuation of the property subject to privately imposed restrictions has been held subject to the rule that it should be valued as burdened, taking into consideration the likelihood of the removal of such restrictions. 4 Nichols, *supra,* Suppl. p. 12–379, sec. 12.321.

The agreements provided a sufficient foundation for evidence of value based upon an assumption that the use of the property was limited and that this would affect how much a purchaser was willing to pay. This court has stated that unless the matter is so clear that it becomes a question of law, " '. . . it is generally a question for the jury to determine whether the proposed factor underlying in part the opinion of the expert as to the fair market value, is one which would have reasonably been considered by the willing buyer and the willing seller.' " *Volbrecht v. State Highway Comm., supra,* page 645. It

cannot be said that a willing buyer would not have considered the restriction on the use of this property as a matter of law. Therefore, the opinions were properly admitted as it cannot be said that they were without probative value as a matter of law.

The appellant also contends that the appraisals by the three witnesses for DNR are without probative force as they did not take into account what the highest and best interim use of the land would be assuming that the Bong plan was not feasible.

We do not consider this contention to be supported by a fair reading of the record. Much of the land had been compacted by the federal government for runway facilities during the time it was being developed for the Bong Air Force Base. Gutschenritter testified that he considered an agricultural use of the land as an interim use, but as the land was largely compacted making it a poor farming risk, he was not able to conclude that the land was as valuable as the surrounding undisturbed farmland. Mayo also testified that he based his valuation on an interim agricultural and recreational use. He too concluded that it would not be as good agricultural land as the surrounding area because of the soil compaction, and reduced his valuation accordingly. Anderson based his appraisals on a combined agricultural, rural residential and recreational use as being the highest and best use of the property. Based on the assumption that the Bong agreements restricted the use of the land, which would prevent permanently and fully developing the land in this way, he opined that the value of the land was $210,000 and the option $8,000. He further testified, on cross-examination by the appellant, that this figure was determined with the thought that a subsequent purchaser might buy the land with the hope of having the deed restrictions removed. This possibility, which was not given express consideration by either Mayo or Gutschenritter, serves to explain the dif-

ference between Anderson's lowest appraisal and those of DNR's other two appraisers.

The view that the land which had been compacted was not highly prized agricultural land was supported by the testimony of other witnesses. While there was evidence that the government had attempted to restore the compacted land by replacing the topsoil, Arthur E. Peterson, a professor of soil science from Madison, called by DNR, testified that the soil structure had been so disrupted that the land was not capable of absorbing moisture, making the land very marginal for farming. William P. Simpson, whose company, J. I. Case, had leased the land for farming purposes between 1968 and 1969, testified for DNR that they lost money on the farming operation primarily due to the poor soil conditions.

The appellant further contends that the appraisals of Gutschenritter and Anderson were without probative value because they were based on comparable sales of other property as improperly adjusted by the appraiser to allocate an incredible amount of the actual purchase price to the buildings on the land. Gutschenritter and Anderson testified that the adjustment was made to indicate what portion of the actual purchase price reflected the value of the raw land, making the sale more comparable to the actual status of the barren Bong lands.

This court has held that sales used as a foundation of an expert's opinion of value are admissible and, if not comparable, go to the weight of the expert's opinion, not their admissibility. *Besnah v. Fond du Lac, supra,* page 762; *Weeden v. Beloit, supra,* page 668. It is the function of the jury to evaluate the foundation for the expert's opinion and to accord to that opinion such weight as the jury deems appropriate. The jury is free to accept or reject the judgment of the expert as to what sales are comparable or as to how they should be adjusted if not strictly comparable. *James Madison Development Corp. v. State, supra,* page 635; *Besnah v. Fond du Lac,*

*supra,* page 762. As such, the opinions of the two experts here challenged were entitled to whatever weight the jury chose to give them and were admissible for that purpose.

The appellant next asserts that it was error for the trial court to admit testimony with regard to the price paid by the appellant to acquire the land in question.

In *Huse v. Milwaukee County Expressway Comm.* (1962), 16 Wis. 2d 225, 114 N. W. 2d 429, this court adopted the general rules relating to the introduction of the price paid for the land under condemnation by the condemnee as proof of the present market value of the land as those rules were set forth in Annot. (1957), 55 A. L. R. 2d 791. At page 228, this court quoted that annotation as follows:

" 'Evidence of the price paid for condemned real property on a sale prior to the proceedings in which condemnation is sought is generally admissible in such proceedings, at least where the sale is voluntary, is not too remote in point of time, or is not otherwise shown to have no probative value.'

" . . .

" 'The matter of a change of circumstances between the date of the purchase and the date of the taking may be of considerable significance in determining the admissibility of evidence of the price paid.' "

*See also:* 4 Nichols, *supra,* pp. 12–115, 12–116, sec. 12.311 [1]. Whether comparable sales offered to prove value are comparable and admissible is a decision within the discretion of the trial court which will not be reversed unless clear error. *Weeden v. Beloit, supra,* page 668. It has been stated that the same rule applies where the comparable sale offered is a prior sale of the land in question. Annot. (1957), 55 A. L. R. 2d 791, 811.

The appellant argues that the purchase was too remote in time to be admissible. He contends that although the sale took place in 1964, the price was based on an appraisal made prior to May, 1961. In support of this

argument, the appellant points to the fact that the May, 1961, minutes of the Bong Commission indicate that the land had been appraised by the federal government.

The DNR points out that the minutes of the Bong Commission show that a reappraisal of the lands was called for on February 5, 1963, and that the June, 1963, minutes refer to the price as a reappraisal. The DNR also contends that the actual sale took place in either February, 1964, when the first agreement was signed or May, 1965, when the subsequent agreements were signed.

The trial court found that the sale occurred in February, 1964, and this finding was not against the great weight and clear preponderance of the evidence.

The DNR further contends that the lapse of time between 1964 and the date of taking, December, 1969, was not so long as to make the prior sale inadmissible. The trial court agreed.

This court has recognized that, under the right circumstances, a time of up to eleven years might not be too remote. *Huse v. Milwaukee County Expressway Comm., supra,* page 228, citing Annot. (1957), 55 A. L. R. 2d 791, *et seq.* On the other hand this court also recognized in the *Huse Case* that a change in circumstances during the intervening time may affect the view of what amount of time is too remote.

The appellant contends that circumstances have vastly changed, making the prior sale too remote to be admissible. The evidence on this issue conflicted greatly. Most of the witnesses, both for DNR and the appellant, conceded that the area surrounding Bong was in a state of transition from strictly agricultural to agricultural and rural residential. The witnesses for DNR were of the opinion that this was a rather stable period, not reflecting tremendous growth in the area. This was particularly the view of Ronald N. Nicotera, a game manager for DNR in the area, Anderson, Gutschenritter, and Clinken-

beard, the regional planner. Gladstone, the appellant's key witness as to the feasibility of the project, indicated that the plan's success was primarily based on the ability of the plan to stimulate growth in the area that otherwise had not occurred. On the other hand, Frierdich, one of appellant's appraisers, indicated that the Bong lands were in the predevelopment stage which was a period marked by the highest increase in value. In regard to the actual land in question, it remained untouched except for some vandalism to the existing facilities.

The evidence of changed circumstances does not indicate that the prior sale was so remote in time as to be without probative value. Therefore, the trial court's finding that the sale was not too remote to be admissible is not against the great weight and clear preponderance of the evidence.

The appellant further asserts that the prior sale lacked probative value because the price did not reflect full value for the property. It has been generally held that a prior sale is not admissible where special circumstances induced the sale at a price other than true market value. Annot., 55 A. L. R. 2d 791, 800. The appellant relies on an entry in the Bong Commission minutes of May, 1961, reflecting the fact that the federal government wanted the purchase price to be kept confidential in case the property had to be put up for public auction at some later date. The appellant asserts that this creates an inference that the purchase price was below fair market value. There was also testimony from the former chairman of the Bong Commission, David Carley, that the price paid to the federal government represented, in part, a desire by the federal government to get the land back into the hands of the state and eventually to a developer. According to Carley, the price was negotiated rather than bid, and the price agreed upon was far less than what the value of a planned community and its acreage would be. However, Carley left the Bong Commission

prior to when the purchase by the appellant was arranged.

On the other hand, the federal statute governing the sale of these lands to the state, while permitting a negotiated sale, required that the government obtain the estimated fair market value for the land. 40 USCA, sec. 484 (e) (3) (H). The presumption that governmental agencies comply with the law unless evidence is introduced to the contrary supports the view that the price reflected the estimated fair market value of the land. *See, e.g., Whitman v. Department of Taxation* (1942), 240 Wis. 564, 577, 578, 4 N. W. 2d 180. The desire of the federal government to get the land into the hands of the state at the lowest price possible was accomplished by giving the land destined for conservational purposes, land not at issue on this appeal, absolutely free under a separate federal program. Thus, it cannot be said with certainty that the price set for the purchased land was intentionally negotiated below fair market value.

The inference which the appellant draws from the desire of the federal government to keep the purchase price confidential in 1961 is not particularly relevant to whether the price the appellant agreed to pay in 1964 was below fair market value. As earlier stated, the minutes of the Bong Commission indicate that the land was reappraised in 1963, and the price was then made public.

There was evidence that prior to the appellant's purchase of the subject land, the Bong Commission made repeated unsuccessful attempts to sell part of the land to other buyers by such methods as public advertisement in January, 1964, and private contacts by members of the commission. Lucian Schlimgen, former assistant director, and at the time of trial, director, of the Wisconsin Division of Economic Development, testified for the appellant that he was involved in extensive unsuccess-

ful attempts to try to sell the Bong land to industrial developers. This evidence reflects that the eventual sale to the appellant was a bona fide transaction where the price reflected the risk involved in undertaking the development of the Bong plan—a new city. It would appear that part of the consideration the appellant paid, to put it in Herro's own words, was ". . . to undertake a project that some other people might not have been willing to risk," which would take ". . . millions of dollars and untold thousands of hours of time, energy, talent, devotion [and] dedication . . . through the whole course of . . . 14 years."

It is DNR's position, therefore, that if special circumstances did exist at the time of the sale which induced a lower price, those circumstances were that the appellant assumed a special risk by agreeing to develop the Bong plan. It is contended that these "special circumstances" still existed on the day of the taking as any purchaser would be required to assume the same risk because of the deed restrictions, making the prior sale comparable. This was precisely the position taken by Mayo and Gutschenritter who based their appraisals primarily on the price of the prior sale after adding on what they believed to be a reasonable amount to reflect the rise in land values generally in the surrounding area during the intervening years.

Of further significance are the circumstances under which the evidence of the prior sale was introduced. It was first introduced on cross-examination of Frierdich to rebut the appellant's contention that the property was worth $2,550,000. Such evidence is generally admissible for this purpose. 4 Nichols, *supra*, p. 12–116, sec. 12.311 [1]. Next, the sale was used by DNR's experts Mayo and Gutschenritter as a foundation for their opinion as to the value of the property. When a comparable sale is used in this fashion, this court has held

that the normal rules of comparable sales governing their introduction as direct evidence of value are not applicable and that the sale goes to the weight to be given the expert's opinion by the jury, not admissibility. *Besnah v. Fond du Lac, supra,* page 762; *Weeden v. Beloit, supra,* page 668.

A complete review of the record in the present case leads us to conclude that the trial court's decision to admit evidence of the prior sale of the subject property to the appellant under the circumstances of this case did not constitute an abuse of discretion, and that there was sufficient evidence to sustain the jury's verdict.

The appellant also moved the trial court for a new trial on the issue of damages subject to the rule of *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393, whereby the trial court would modify the judgment increasing the amount of damages unless DNR elected to have a new trial.

The appellant contends the trial court erred in excluding evidence that would have allegedly shown DNR, itself, value the appellant's interests at $600,000.

The basis for this contention is that a letter sent to the then governor by the secretary of DNR on August 15, 1969, was admitted by the trial court only after excision of the amount of DNR's latest offer to the appellant for all of his interest in the Bong lands. The letter stated in relevant part:

"We find it is vitally important at this time to proceed with condemnation and employment of private counsel for the following reasons:

"1. Negotiations with Herro and Associates have proven unsuccessful. Our last offer to purchase all their respective rights and interests in the amount of $600,000 [figure excised] dated July 25, 1969, was rejected and no counteroffer has been made by them.

"2. If we do not begin condemnation immediately, it will be necessary for us to convey lands to Herro and Associates as requested pursuant to the Court's decision.

This would undoubtedly result in substantially higher costs to the State due to consolidation of the lands and improvements which may be made."

Attached to the letter was a data sheet which contained the following:

"On July 22, 1969, we received an updated appraisal in the amount of $450,000 for the 977-acre parcel. An offer of $600,000 [figure excised], made on July 25, 1969, was refused by Mr. Herro in a letter dated August 4, 1969.
"The appraisals in this case were made by the Real Estate Research Corporation of Chicago, Illinois. Values assigned were as follows:
"  977 acres—$450,000
"1,591 acres—$675,000"

The date of the subject offer, July 25, 1969, followed the decision of this court in *Herro v. Wisconsin Federal Surplus Property Development Corp., supra,* decided April 1, 1969, which determined that DNR had to either transfer the land to the appellant under the agreements or condemn the land. As this court's opinion in *Herro v. Natural Resources Board, supra,* page 162, reveals, negotiations between DNR and the appellant to purchase the appellant's interests had been in progress since 1967, but the parties could not get together on a price. The appellant made an offer of proof that the offer of July 25, 1969, was allegedly rejected by the appellant for the reason that he wished to appear at a hearing on August 14, 1969, to persuade DNR not to condemn the property. At this meeting DNR decided to seek condemnation and the trial judge in the original action, Judge CHARLES, by consent of the parties, subsequently decided not to render final judgment pending the outcome of the condemnation proceedings, acknowledging, however, that if the condemnation were abandoned, the value of the 1,591-acre tract would be determined and the appellant, who had exercised the option, would proceed with the develop-

ment of the land. *Herro v. Natural Resources Board, supra,* pages 164, 165.

This court has held that offers to purchase land made by the condemnor during negotiations prior to the institution of condemnation proceedings are privileged and inadmissible. *Connor v. Michigan Wisconsin Pipe Line Co.* (1962), 15 Wis. 2d 614, 113 N. W. 2d 121. The basis for the rule is the policy to encourage settlements. *Connor v. Michigan Wisconsin Pipe Line Co., supra. See also:* 4 Nichols, *supra,* p. 12–118, sec. 12.311 [2] ; Annot. (1967), 15 A. L. R. 3d 13, 17.

The appellant argues that the *Connor* rule is inapplicable as the July 25, 1969, offer was made prior to the decision to institute condemnation proceedings. The appellant relies on *State Medical Society v. Associated Hospital Service* (1964), 23 Wis. 2d 482, 128 N. W. 2d 43, wherein this court determined that communications sent by one party showing acquiescence in, or recognition of, the contentions of the other party in a contract dispute at a time when the controversy had arisen but not when the parties were attempting to settle it, were not offers of compromise but admissions made against interest and admissible.

This court stated in *Associated Hospital Service, supra,* at page 493 :

"It may often be difficult to determine whether a given statement is made as part of the negotiations in which the controversy is recognized or is made as part of an offer of compromise. We believe that each case will have to stand on its own facts . . . ."

In the *Connor Case,* this court also stated at pages 623, 624 :

"We are of the opinion that trial courts should be particularly careful in admitting into evidence any admissions of value made during settlement negotiations. . . . A sound policy reason exists for the applica-

tion of a restrictive, rather than liberal, rule of admissibility with respect to admissions of value, based on the fact that the opposite party is not required to resort to such admissions to prove value."

In the present case, while the formal decision had not yet been made to institute condemnation proceedings, the history of the pending litigation and the prior negotiations clearly indicated that DNR intended to reacquire the property. Under the facts of this case, the offer was made during negotiations to settle the ongoing dispute of the parties and with a view toward initiating condemnation proceedings. As such, the offer was privileged. *Connor v. Michigan Wisconsin Pipe Line Co., supra.*

The appellant also contends that the letter written to the governor, which repeated the amount of the offer, constituted an admission of independent fact by the DNR that the fair market value of the land was at least $600,000.

The letter contains no express statement that the fair market value of the land was at least $600,000. At best, that is only an inference which can be drawn from the letter.

In *Connor v. Michigan Wisconsin Pipe Line Co., supra,* page 623, this court held:

". . . For the purposes of the exclusionary rule with which we are concerned, no admission of value is *clearly established* in a situation in which a jury must resort to inference to find that such admission was made. . . ."

In effect, the appellant is attempting to get the amount of the settlement offer, otherwise inadmissible, into evidence by virtue of the fact that it was related to the governor some time after it was made. Had the letter contained an express statement that the offer constituted what DNR felt to be the true and fair market value of the property, the appellant's argument would be more

persuasive. *See, e.g.,* Annot. (1967), 15 A. L. R. 3d 13, 18, 45, citing *People ex rel. Department of Public Works v. Forster* (1962), 58 Cal. 2d 257, 23 Cal. Rptr. 582, 373 Pac. 2d 630. However, as the letter only supports an inference, it is no more admissible than direct testimony of the amount of the offer.

The appellant further contends that the testimony of J. Robert Smith, an administrator of DNR and author of the letter, called adversely by the appellant, that DNR's policy was to offer appraised market value prior to condemnation, makes the amount of the offer probative and relevant.

Smith also testified that DNR would frequently offer 10 percent over the value of the land and would also exceed that if special circumstances were presented. Moreover, the basis for excluding settlement offers is not a lack of relevancy or probative value, but that the exclusionary rule, based on privilege, is supportive of the public policy in favor of settlements. *Connor v. Michigan Wisconsin Pipe Line Co., supra,* pages 619–621. Therefore, the policy of DNR in making offers has no bearing on the admissibility of the amount of the offer, and, of course, Smith never testified that $600,000 represented what DNR considered to be the value of the interests at the time the offer was made.

The trial court's decision to exclude the amount of the prior offer was not error.

The appellant next contends that the trial court committed error in refusing to admit evidence of what DNR had paid for land surrounding the Bong Base not pursuant to formal condemnation proceedings.

The rule in Wisconsin on this issue is settled and does not support the appellant's position. In *Blick v. Ozaukee County* (1923), 180 Wis. 45, 46, 192 N. W. 380, this court stated:

". . . The great weight of authority, however, is to the effect that the price paid in settlement of condemnation

proceedings, or the price paid by the condemnor for similar land, *even if proceedings had not been begun,* where the purchaser has the power to take by eminent domain, is not admissible. . . ." (Emphasis supplied.)

In *Kirkpatrick v. State (DNR)* (1972), 53 Wis. 2d 522, 525, 526, 192 N. W. 2d 856, this court reaffirmed the rule of the *Blick Case.* The trial court did not err in refusing to admit the evidence and it did not abuse its discretion in refusing to apply the *Powers* rule. The trial court properly reviewed the evidence under the applicable rules of law governing its sufficiency and made no error in either including or excluding evidence. When such is the case, the decision of the trial court not to apply the *Powers* rule cannot be characterized as an abuse of discretion. *Longville v. Leusman* (1970), 48 Wis. 2d 251, 260, 179 N. W. 2d 823.

The appellant also moved the trial court to grant a new trial in the interest of justice, relying on all the grounds heretofore discussed and in addition claiming that the final argument of DNR to the jury contained prejudicial assertions.

This court has stated that a trial court's ruling upon a motion for a new trial in the interest of justice is highly discretionary and will not be reversed on appeal in the absence of a clear showing of abuse of discretion or an erroneous application of the law. *Chille v. Howell* (1967), 34 Wis. 2d 491, 494, 149 N. W. 2d 600. In situations where the trial court has considered the advisability of granting a new trial in the interest of justice and concluded that it should not be granted, this court is ordinarily inclined to defer to this decision of the trial court. *Chille v. Howell, supra,* page 494; *Baker v. Herman Mut. Ins. Co.* (1962), 17 Wis. 2d 597, 607, 117 N. W. 2d 725.

The appellant claims that counsel for DNR used the purchase price paid by the appellant for his interests to prejudice the jury. He contends that "[t]he thrust of his argument was that it would be unconscionable to

permit Herro to make a substantial profit" and to "persuade them to disregard [the evidence of] actual market values . . . and base their verdict on how much they thought it 'fair' for Herro to make."

This court has recognized that the contents of the arguments to the jury is a matter lying within the discretion of the trial court. Wide latitude is recognized in the giving of arguments and this court will not intrude where the trial court did not see fit to criticize the argument in question. *Fields v. Creek* (1963), 21 Wis. 2d 562, 572, 573, 124 N. W. 2d 599. *See also: State v. Richardson* (1969), 44 Wis. 2d 75, 83, 84, 170 N. W. 2d 775.

A complete review of the argument made by counsel for DNR does not persuade us that the trial court abused its discretion in permitting it. The references contained in the argument to the price paid by the appellant were made with regard to the evidence concerning what had transpired in the area which made the value of the land change between 1964 and 1969 from the price paid to the $2,500,000 sought by the appellant. Clearly this argument went to the reasonableness of DNR's expert's use of the prior sale as a comparable sale after adjusting it for what they believed to be warranted by the increase in land values in the area in question. It also constituted a fair comment on why the appraisals of the appellant's experts were not entitled to great weight with the jury, as well as a fair comment on why the evidence of the appellant on the feasibility of the project was not to be believed. This evidence and the comment thereon was certainly relevant to the issue of fair market value.

The trial court did not abuse its discretion in failing to grant a new trial in the interest of justice.

After a review of the record, we arrive at the independent judgment that the real controversy has been fully tried and that it is not probable that justice has for any

reason miscarried. We are of the further opinion that the judgment should not be modified with an additur under the *Powers* rule.

*By the Court.*—Judgment affirmed.